SUSAN M. CHEHARDY, Chief Judge.
| ..Defendant, Daniel Parks, Sr., appeals from his conviction of aggravated rape of a juvenile and sentence of life imprisonment. For the reasons that follow, we affirm defendant’s conviction and sentence.

PROCEDURAL HISTORY

On December 6, 2012, a Jefferson Parish -Grand Jury indicted defendant with aggravated rape upon a known juvenile (D.O.B. 2/26/72), wherein the victim was under the age of twelve, a violation of La. R.S. 14:42 (count one), and with possession of marijuana, second offense, a violation of La. R.S. 40:966(C) (count two). Defendant was arraigned and pled not guilty to both charges. Following a trial by jury, a twelve-person jury unanimously found defendant guilty as charged on December 12, 2013. On January 9, 2014, following the denial of defendant’s motions for post-verdict judgment of acquittal and new trial, the trial court sentenced defendant on count one to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The State dismissed count two. Defendant’s motion to reconsider sentence was denied that day and this appeal followed.

UFACTS

*932 T.L.,[1] who was forty-one years old at the time of trial,[2] testified that defendant raped her when she was seven or eight years old. She explained that she grew up in Waggaman, Louisiana, where her family resided next door to defendant, who had been best friends with her father, L.G., since high school. L.G. testified that he trusted defendant and allowed him to babysit T.L. and her younger brother, L.L. T.L. described one such occasion where defendant, while watching his own son along with T.L. and L.L. at his house, asked the children if they wanted to play hide and go seek, to which they all agreed. Defendant directed his son and L.L. to go to his son’s room and count to ten. Once the two boys left, defendant grabbed T.L.’s hand and led her into his bathroom, shut the door, locked it, and turned off the light. When T.L. asked why the door was locked and the light was off, defendant explained, “so they wouldn’t find us.” Defendant laid T.L. down on the floor and removed her shorts and underwear. T.L. heard defendant’s zipper and then felt defendant lay on top of her and insert his penis into her vagina. He began rocking up and down and was breathing heavily. T.L. told him that it hurt, and he told her that he was almost finished. L.L. and defendant’s son then knocked on the door, saying that they had found them. Defendant put his hand over T.L.’s mouth and whispered into her ear: “If you ever tell anybody, I’ll kill your dad and your brother.” He then told her to get dressed and go play.
Years later, T.L. and her children attended a crawfish boil at defendant’s house to visit with her father, who was often out of town for work. At some point that day, T.L. walked into the kitchen where defendant was stirring a pot of gumbo. She wanted to confront him, but was rendered speechless, so she stared at him and he stared back. He then said, “Do you want to end up like Stephanie, do you?” T.L. understood defendant l4was referring to Stephanie Hebert, a childhood friend of T.L.’s who defendant also babysat and who was the victim of an unsolved murder in 1978 at the age of six. Interpreting defendant’s remark as a threat, T.L. gathered her children and left.
Over a decade later, following Hurricane Katrina, T.L. had moved to Arkansas and in 2012, she called defendant, confronted him, and told him that she was going to contact the police. Indeed, on July 24, 2012, Lieutenant Ralph Sacks of the Jefferson Parish Sheriffs Office received a long-distance telephone call from T.L., after which he set up a meeting between T.L. and Detective Kay Horne. In August of 2012, T.L. gave a statement identifying defendant as the man who raped her. Following T.L.’s statement, Detective Home obtained a search warrant for defendant’s residence. On August 17, 2012, during the search of defendant’s residence, Lt. Sacks encountered defendant, advised him of his Miranda[3] rights, and explained the nature of the officers’ presence. Defendant indicated he understood his rights and agreed to accompany the officers back to the detective bureau. Once back at the bureau, defendant was led into an interview room where Detective Home executed a waiver of rights form with him. Defendant indicated that he understood his rights, waived them, and provided a statement.
*933 In his recorded statement, which commenced at 2:00 p.m., defendant explained to Detective Home that T.L. had called him about one month prior, wherein she accused him of raping her and told him that she was going, to come to New Orleans and speak to the District Attorney about it. He admitted that when T.L. was seven or eight years old, they played hide and seek, that they might have hidden in the bathroom when the lights went out, that he might have fallen on top of her, and that they were rolling around trying to get up. He acknowledged that he might have touched T.L. inappropriately, but he denied inserting his penis into her vagina. This statement concluded at 2:25 p.m. .
|RFolIowing this statement, defendant provided a second recorded statement, which commenced at 5:29 p.m. In this statement, he acknowledged that he had been advised of his rights and that he waived' them. Defendant then went on to explain that he and T.L., who was about eight years old at the time, hid in the bathroom together while playing hide and seek. While in the darkened room, T.L. and defendant stumbled and when defendant “hit the floor at the right spot thé hand was in the right spot to- feel someth-in[g] and I guess you know the ... animal instinct more or less started to take over.” He admitted that he touched the outside of T.L.’s vagina with his hand and became aroused. Clad in short shorts, defendant admitted his penis “did come out;” and he attempted to put it near her vagina, but as he made contact with her, he stopped and pulled back. He denied fully inserting his penis, but admitted that the head of his penis might have touched her skin, penetrating approximately one-eighth to one-quarter of an inch into her vagina. He denied threatening T.L. This statement concluded at 5:35 p.m.
Then, in a third recorded statement, in which defendant again acknowledged that he understood his rights and remained willing to waive them, defendant admitted that he made a statement to T.L. to the effect of: “Get out of here before they find you like they found poor little Stephanie Hebert.” Defendant denied that this was a threat, and denied kidnapping, raping, or murdering Stephanie Hebert. This statement concluded at 8:26 p.m.[4]
The next day, August 18, 2012, at 3:10 p.m., defendant made a telephone call from the Jefferson Parish Correctional Center to his wife. Deputy Eva Banner, the custodian of recorded telephone calls at the correctional center, authenticated the recording of defendant’s telephone call which was played for the jury. In the conversation, defendant repeated many of the same things he had said in his statements. He explained that he did something “stupid,” that he touched the victim with his hand on her vagina, that he wasj^using drugs at the time, and that he was wearing “short shorts” and “it popped out.” He stated that he did not do anything but “it was in the vicinity” and that he stopped himself before anything happened. Defendant asserted that he put the “old bird” by her vagina, but that it did not go in. He explained that the incident happened in the hall bathroom and that the lights were out while they were playing hide and seek. He said he regretted what had happened and felt bad that he had caused the victim a lot of grief. He further said that he was glad to get the “guilt” off his shoulders, that he realized what he did was wrong, and that it was in the back of his mind all these years, but he did not want to remember it.
Dr. Neha Mehta, the Medical Director of the Audrey Hepburn Care Center at Children’s Hospital and an expert in child *934 abuse pediatrics, testified that it is common for children to delay disclosing that they have been sexually abused. One reason for such delayed disclosure, Dr. Mehta offered, is that the child has been threatened with negative consequences if disclosure is made. Dr. Mehta further explained that over ninety percent of child sex abuse cases involve perpetrators who know the child, often a family member or care provider, and have access .to the child.
Tara Phillips testified for the defense that she grew up on the same block as T.L. and defendant, that she was around the same age as defendant’s son, and that she often spent time at defendant’s house. She stated that she never saw defendant do anything inappropriate to children, that she never observed children exhibit any fear of defendant, and that she never saw children interacting with defendant.
Likewise, Debra Parks, defendant’s wife of forty-one years at the time of trial, testified that she never received any complaints about her husband being inappropriate with children, that her husband has never displayed an improper interest in children, and that she has never seen him do anything inappropriate with any child. She identified her voice on the recorded phone call from her husband while in jail.
17Pefendant took the stand and testified that at 10:30 a.m. on August 17, 2012, police officers arrived at his house and asked him to accompany them back to the detective bureau for questioning, where he remained for eight to nine hours. He had not eaten breakfast that morning and had not eaten anything since 4:30 p.m. the day before. He testified that he did not rape T.L., that he did not have intercourse with her, and that his penis never penetrated her vagina. He explained that he told the police his penis may have penetrated her vagina because as a diabetic, after eight hours of questioning with no food since the day before, he became tired and lightheaded and said whatever he thought would terminate the questioning. He maintained that he fell in the darkened bathroom and accidentally touched T.L. as he was trying to get off the floor. He denied evér threatening T.L. and explained that his comment to T.L. about Stephanie Hebert years later was made out of anger at being disturbed while cooking. He maintained that it was not a threat.
Defendant further acknowledged that at the time he spoke with his wife on the phone from jail he had eaten “a couple of meals.” And on cross-examination, defendant admitted that his penis accidentally “slid out” from the side of his cut-off jean shorts when he fell on top of T.L. and that his penis touched her. He explained that his penis got near her vagina because he was rolling around and trying to get up.

DISCUSSION

In defendant’s sole assignment of error on appeal, he argues that the trial court abused its discretion in allowing the State to introduce testimony that defendant was likely responsible for the murder of Stephanie Hebert without any evidence to substantiate the accusation.[5] He contends that evidence of the Hebert crime was not ^probative of the aggravated rape of T.L. and that testimony from Captain Dennis Thornton that defendant was a major suspect in the Hebert murder case was unfair and prejudicial.
Defendant had sought to exclude references to the Hebert case prior to trial. On October 8, 2013, defendant filed a motion in limine seeking to exclude any reference to the unsolved Hebert murder case. Fol *935 lowing a hearing on October 31, 2013, the trial court denied the motion, ruling:
The purpose is not to show that [defendant] had a connection- to this other crime. Certainly, the Court understands the Motion in Limine on behalf of the defense, but if the purpose is not to show any connection to another crime but to show that this defendant made such a statement to the victim in order to prevent the victim from coming forward, then the Court believes that it would [be] appropriate for that information to come in.
Defense counsel objected to this ruling.
The record is replete with references to the Hebert murder ease. T.L. testified that when attempting to confront defendant years after the rape in his kitchen, he told her, “Do you want to end up like Stephanie, do you?” T.L. explained that she interpreted this as a threat. Defendant himself, at trial and in his statement to police, admitted to making this remark. At trial, he admitted that he made the remark about Hebert, though not as a threat, but out of anger at being disturbed while cooking. And in his third statement to the police, which was published to the jury, defendant admitted saying “If you don’t get out of here they gone [sic] find you on the side the road like they did poor Stephanie.” Lieutenant Larry Dyess, who obtained defendant’s second statement, testified that defendant’s reference to Hebert warranted further investigation. And Captain Dennis Thornton, who obtained defendant’s third statement, presented a history of the Hebert case to the jury and stated that defendant’s remark was the biggest lead in the case. He explained that while no physical evidence linked defendant to the Hebert murder, he had not been ruled out as a suspect.
|9The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because he has committed other such crimes in the past. State v. Williams, 09-48 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 363, writ denied, 09-2565 (La.5/7/10), 34 So.3d 860. However, such evidence may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule when it tends to prove a material issue and has independent relevance other than showing that the defendant is of bad character. State v. Dauzart, 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165.
The statutory exceptions, as provided in La. C.E. art. 404(B)(1), permit the admission of other crimes evidence for “proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, ... or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.” In order for other crimes evidence to be admitted under La. C.E. art. 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. State v. Cotton, 07-782 (La.App. 5 Cir. 2/19/08), 980 So.2d 34, 42, writ denied, 08-0603 (La.10/3/08), 992 So.2d 1010. Further, the probative value of the extraneous evidence must outweigh its prejudicial effect. Id. The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. Id.
Clearly, evidence of other crimes or bad acts is prejudicial since all evidence that tends to make it more probable than not that an individual committed a criminal offense is necessarily prejudicial. Cotton, 980 So.2d at 42. The underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial, but to protect against unfair prejudice when the *936 evidence is only marginally relevant to the determination of guilt of the charged crime. Id. Absent an abuse of discretion, a trial |incourt’s ruling on the admissibility of evidence pursuant to La. C.E. art 404(B)(1) will not be disturbed. Id.
In the present case, we find evidence of the Hebert murder case was admissible as evidence relating to “conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.” This evidence, formerly referred to as res gestae, is deemed admissible because it is so nearly connected to the charged offense that the State could not accurately present its case without reference to it. State v. Taylor, 01-1638 (La.1/14/03), 838 So.2d 729, 741, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). The res gestae doctrine is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime, if a continuous chain of events is evident under the circumstances. Id. The res gestae doctrine is designed to allow the story of the crime to be told in its entirety, by proving its immediate context of happenings in time and place. Id.
Although res gestae evidence typically must bear “a close proximity in time and location” to the charged offense, Taylor, supra, we find the chronology of the instant case is atypical in that more than thirty years elapsed between the commission of the offense and its being reported to the authorities, a timespan during which the victim and defendant occasionally interacted. During one such interaction, defendant threatened T.L. by alluding to the unsolved murder of Stephanie Hebert, a female child close in age to T.L. who resided in the same neighborhood and whom defendant also babysat. This threat, even though it occurred years after the rape, is clearly relevant to and probative of the charged offense. And because the threatening nature of the remark is not evident on its face, details of the Hebert case were necessary to elucidate the meaning of the remark. Under such circumstances, we find evidence of the Hebert case served the purpose of res \ ^gestae evidence by giving context and meaning to defendant’s threatening remark. Although this evidence was unquestionably prejudicial, we find that its probative value outweighed its prejudicial effect. Thus, the trial court did not abuse its discretion in permitting the introduction of this evidence.
Yet, even if it was error to admit this evidence, its admission is subject to a harmless error analysis. See State v. Williams, 09-48 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 365, writ denied, 09-2565 (La.5/7/10), 34 So.3d 860. The test for determining if an error was harmless is whether the verdict actually rendered in the case was surely unattributable to the error. Id.
We find that the evidence at trial, exclusive of evidence of the Hebert case, was sufficient to convince a rational trier of fact beyond a reasonable doubt that defendant was guilty of aggravated rape. First, T.L. testified that defendant raped her when she was a child; and the testimony of the victim alone is sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. See State v. Videau, 13-520 (La.App. 5 Cir. 12/27/13), 131 So.3d 1070, 1082, writ denied, 14-212, 160 So.3d 965, (La.9/12/14). And second, defendant himself admitted to committing the crime. Although he later recanted at trial, it is the role of the fact-finder to weigh the credibility of witnesses, *937 and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson[6] standard of review. See State v. Carter, 13-94 (La.App. 5 Cir. 10/30/13), 128 So.3d 1108, 1113, writ denied, 13-2701 (La.4/25/14), 138 So.3d 644. In returning a guilty verdict, the jury evidently found defendant’s admission of guilt more credible than his recantation.
| ^Therefore, even if the trial court erred by admitting the evidence in question, we find the jury’s verdict was supported by other evidence and was surely unattributable to such error. This assignment of error is without merit.

ERRORS PATENT

We have reviewed the record for errors patent, according to La. C.Cr.P. art. 920, and note two requiring corrective action.
First, the record does not reflect that defendant was notified of Louisiana’s sex offender registration requirements in accordance with La. R.S. 15:540 et seq., which mandates registration of and notification to sex offenders. Specifically, La. R.S. 15:543(A) requires the trial judge to provide written notification to the defendant of the registration and notification requirements. This Court has found that the failure to provide this notification, even where a life sentence has been imposed, is an error patent warranting remand for written notification. See State v. Williams, 09-48 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 368-69, writ denied, 09-2565 (La.5/7/10), 34 So.3d 860. Therefore, we remand this matter for compliance with La. R.S. 15:540 et seq.
We also find that the State of Louisiana Uniform Commitment Order incorrectly reflects the offense date as August 17, 2012 and the adjudication date as January 9, 2014. The evidence at trial showed that the rape occurred when T.L. was seven or eight years old and that T.L.’s date of birth is February 26, 1972. Consequently, the offense occurred on or between February 26, 1979 and February 25, 1981. The record also reflects that the jury returned its verdict on December 12, 2013. Therefore, we remand for correction of the offense and adjudication dates as contained in the Uniform Commitment Order. The Clerk of Court for the 24th Judicial District Court is ordered to transmit the original of the corrected Uniform Commitment Order to the officer in charge of the institution to which defendant has been sentenced and to the Department of Corrections’ legal | ^department. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142 (citing La. C.Cr.P. art. 892(B)(2)).

DECREE

For the foregoing reasons, defendant’s conviction and sentence are affirmed. The matter is remanded for compliance with La. R.S. 15:540 et seq., and for correction of the Uniform Commitment Order.

AFFIRMED; REMANDED

.The victim’s initials, as well as the initials of the victim’s family members, are used under the authority of La. R.S. 46:1844(W)(3), which allows the Court to identify a crime victim who is a minor, or a victim of a sex offense, by using his or her initials.

. T.L.’s date of birth is February 26, 1972.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The record does not indicate at what time defendant’s third statement commenced.

. Defendant raised this same issue in his motion for new trial, which the trial court denied after a hearing. In its ruling, the trial court stated that this was relevant evidence that would have to come in based upon the threats made to the victim in this matter.

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).