| STATE OF LOUISIANA | * | NO. 2018-KA-0891 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| D.D. | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. XXX-XXX,[1] SECTION "H"
Honorable Camille Buras, Judge

**Judge Joy Cossich Lobrano**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Joy Cossich Lobrano, Judge Rosemary Ledet)

*Dysart, J., Concurs in the Result.*
*Ledet, J., Dissents with Reasons.*

Leon Cannizzaro
District Attorney
Donna Andrieu
Irena Zajickova
DISTRICT ATTORNEY'S OFFICE
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

      COUNSEL FOR APPELLEE

Kevin Vincent Boshea
ATTORNEY AT LAW
2955 Ridgelake Drive, Suite 207
Metairie, LA 70002

      COUNSEL FOR APPELLANT

                **AFFIRMED.**

                **DECEMBER 27, 2019**

---

[1] *See* note 2, *infra.*

On December 15, 2016, the defendant/appellant, D.D.[2] ("Defendant") was

indicted by a grand jury as follows: two counts of first degree rape, a violation of

---

[2] To protect the identity of the minor children in this child sexual abuse case, names and initials of all involved persons are omitted or altered although their names appear in the sealed appellate record. Our Court, in *D.M.S. v. I.D.S.*, 14-0364, p.1 n.1 (La. App. 4 Cir. 3/4/15), 225 So.3d 1127, 1130, *writ denied,* 15-0897 (La. 6/19/15), 172 So.3d 654, has chosen to use the initials of parties and witnesses to provide for child victim protection in cases, though not directly involving a docketed juvenile CINC case but involving initial stages of a CINC case and the Children's Code, including a Department of Children and Family Services ("DCFS") mandatory report and interview to investigate an allegation of child abuse and a forensic medical examination of a child by a medical professional to medically assess an allegation of abuse. *See* Rule 5-2 of the Uniform Rules, Cts. of App ("initials shall be used in all filings and in opinions rendered by the court of appeal to protect the minor's identity" in order to "ensure the confidentiality of a minor . . . whose interests are the subject matter" in a Child In Need of Care ("CINC") proceeding); La. Ch.C. arts. 404, 412, 603, and 609; La. 46:1844(W)(3). *See also I.F. v. Administrators of the Tulane Educational Fund,* 13-0696, p. 3 n. 1 (La.App. 4 Cir. 12/23/13), 131 So.3d 491, 494 (where this Court noted that "because of the sensitive nature of the facts of this case, we have chosen to use some witnesses' and parties' initials in lieu of their names, although their names appear in the sealed record"). Due to the sensitive nature of such cases, our Court has decided to use initials to identify the victim and any defendant or witness whose name can lead to the victim's identity, including parent, sibling, or relative with the same last name as the victim. *See e.g. Id; D.M.S.*, 14-0364, 225 So.3d 1127. *See also State v. J.M.,* 14-579, p. 2 n. 1 (La. App. 5 Cir. 2/11/15), 189 So.3d 1079, 1083 (where the Louisiana Court of Appeal for the Fifth Circuit held that in the interest of protecting minor victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), the judges of this Court adhere to a policy "that this Court's published work will use only the initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (i.e., parent, sibling, or relative with the same last name as the victim"). *Compare State v. R.W.B.,* 12-453 (La.12/4/12), 105 So.3d 54 (where the Court's was limited to a La. 46:1844(W)(3) analysis and did not address the interpretation of La. 46:1844(W)(3) in light of uniform or local court rules and policies of the Louisiana Court of Appeal for the Third Circuit). *See, e.g., J.A.D. v. K.B.F.,* 2019-257, p. 1 n.1 (La. App. 3 Cir. 11/20/19), ---So.3d---, 2019 WL 6168139 *1 (*unpub.*)(noting that they are not required to use initials to protect and maintain the privacy of the minor children involved in a custody case; however, "we choose to use the initials of the minor children herein due to the nature of the allegations at issue."*See Rodock v. Pommier*, 16-809 (La.App. 3 Cir. 2/1/17), 225 So.3d 512, *writ denied*, 17-631 (La. 5/1/2017), 221 So.3d 70; *Clarke v. Clarke*, 16-669 (La.App. 5 Cir. 4/4/17),

1

La. R.S. 14:42; one count of attempted first degree rape, a violation of La. R.S. 14:27(42); and one count of sexual battery, a violation of La. R.S. 14:43.1. Defendant allegedly committed these offenses against his minor biological daughter ("Victim"), who was thirteen years old at the time of his March 2018 trial. The State of Louisiana ("State") in its indictment alleged that the first count of first degree rape occurred between August 5, 2012 and October 23, 2016; the second count of first degree rape occurred on October 24, 2016; and the counts of attempted first degree rape and sexual battery occurred on November 1, 2016.

In early 2018, a unanimous jury delivered a verdict against Defendant finding him guilty on all counts. After denying Defendant's motions for new trial, in arrest of judgment, and to reconsider sentence, the district court sentenced Defendant to life imprisonment on each count of first degree rape, fifty years on attempted first degree rape, and fifty years on sexual battery, with all sentences to be served without benefit of parole, probation, or suspension of sentence.

## I. FACTS

In 2016, Victim was living at home with Defendant, her mother ("Mother") and her younger siblings, a sister, who was ten years old at the time of trial, and

219 So.3d 1228.") I am bound by my Court's well-reasoned policy and interpretation of the law to protect children in cases involving allegations of child abuse in juvenile, family, and criminal courts. To allow for the disclosure of Defendant's name resulting in the identification of Victim is particularly unsettling considering the ability to perform an internet search, the permanency of internet data, and the ease of which the contents of appellate opinions and dissents can be searched; thus, extending the victimization and needless exposure of the identity of children involved in the justice system well into adulthood. In further following *D.M.S.* and a logical extension of our child victim identification protection case law, identification of the district court's docket number has also been removed to protect the identity of the minor child victim from the general public, although the number appears in the sealed appellate record. *D.M.S.*, 14-0364, p.1 n.1, 225 So.3d at 1130.

two brothers, who were ten and eight years old at the time of trial. Defendant's brother ("Uncle") also lived at the residence. Defendant, as a nail technician, did not work on Mondays, while Mother and Uncle worked out of the house. Mother speaks only Vietnamese.

Defendant allegedly began raping his daughter in 2012 when she was eight years old and in the fourth grade. The State further alleges that Defendant raped Victim on Mondays with the last rape occurring on Monday, October 24, 2016. The State also charged that on November 1, 2016, Defendant attempted to rape and committed sexual battery on Victim.

Shortly after the last alleged rape, Victim disclosed the sexual abuse to her best friend ("A.A.") stating that her father raped[3] her and the rapes occurred on Mondays when her Mother and Uncle were at work and her father was at home from work, and began when she was in the fourth grade. Victim cried as she disclosed the rapes. The disclosure took place at the catholic elementary school that Victim and A.A. attended together. Although she promised Victim that she would not tell anyone, out of fear for the safety of her friend, A.A. told the school's assistant principal and then the school's principal ("Principal") about Victim's statements to her.

After Victim's initial disclosure of the rapes to A.A., Victim consistently confirmed her disclosure of abuse to the following six individuals: Principal, two

---

[3] A.A. testified that, "She told me her dad raped her." When questioned by the State about Victim's exact words, A.A. responded, "she used the word ' Rape. '" Whether the word "rape" is used here in its legal or non-legal sense is of no consequence since it is not disputed that Victim's allegation amounted to "rape, " as defined in La. R.S 14:42, and refers to the sexual abuse on Victim by Defendant.

officers from the New Orleans Police Department ("NOPD"); a caseworker from Louisiana Department of Children and Family Services ("DCFS"); a medical professional at Children's Hospital; and Mother.

On November 4th, after speaking with A.A., Principal called Victim to her office and Victim confirmed the statements she made to A.A. Victim provided additional details of the sexual abuse, telling Principal that Defendant would tell her three younger siblings to go into another room to do homework while Victim cleaned with her father. Principal, as a mandatory reporter,[4] then called 911 and DCFS.

Sergeant Christian Lacey with the NOPD arrived at the school and briefly interviewed Victim with Principal present. The interview was captured by a NOPD body worn camera ("BWC videotape"). Shortly thereafter, NOPD Detective Charles Augustus with the Child Abuse Unit, arrived at school and conducted an interview with Victim, which was audio-recorded. During both interviews by the police officers, Victim again confirmed the statements she made to A.A., and specifically told Det. Augustus that Defendant put his "privates in her privates" and that last time he did that was on October 24th; but that Defendant attempted again on November 1st.

---

[4] Pursuant to La. Ch.C. art. 603(17)(d), a mandatory reporter of sexual abuse includes a "[t]eaching or child care provider . . . who provides or assists in the teaching, training, and supervision of a child." La. Ch.C. art. 609(A)(1) states: "[n]otwithstanding any claim of privileged communication, any mandatory reporter who has cause to believe that a child's physical or mental health or welfare is endangered as a result of abuse or neglect . . . shall report in accordance with Article 610."

4

Later on the afternoon of November 4th, Christopher Martinez, a DCFS caseworker, came to Victim's school to interview Victim, Victim's siblings, and Mother. Victim told Martinez that Defendant had been sexually assaulting her on Mondays since she was eight years old. Martinez spoke to Mother, who was in disbelief and denied Defendant did that to his daughter. Martinez spoke also to D.D. Jr., the then eight-year-old brother of Victim, who confirmed that Victim's three younger siblings were placed in a different room when Victim cleaned with Defendant in another part of the house.

Weeks later in the schoolyard, A.A. saw Victim with a piece of paper and Victim told A.A. that Mother and Uncle made it for her to rehearse saying she had lied about Defendant and he had not abused her. Victim told A.A. that she would get in trouble with Mother if she did not remember it.

On December 2, 2016, Mother bought Victim to the Children's Advocacy Center ("CAC") where Kate Homan ("CAC interviewer"), a forensic interviewer, interviewed Victim. The interview was video-taped, and Det. Augustus observed the interview on a monitor in another room. Before beginning the interview, the CAC interviewer asked Victim if she had any fears that day. Victim replied, "I'm scared I might say the wrong thing." Victim said she didn't want to get Defendant in trouble and did not know that she would get Defendant in trouble. When asked about her disclosure to A.A., Victim said she lied because she was getting bad grades and that Defendant said if they (she and her siblings) got bad grades, he would make them all leave and not come back. Victim stated that she was getting a

5

lot of bad grades at the time; however, Det. Augustus later checked with Principal and was told that Victim was an honor roll student except her grades declined after her disclosure of abuse, then the grades were brought up again.

On December 14, 2016, Mother brought Victim to Children's Hospital at the Audrey Hepburn Care Center. Nurse Practitioner Anne Troy ("N.P. Troy") performed a medical examination on Victim, including an incident history, which included a disclosure of rapes. The exam was facilitated by a Vietnamese-to-English translator to communicate with Mother, who did not speak English. Mother was not present in the room when N.P. Troy initially spoke to Victim. Victim told N.P. Troy that she lied to A.A. because they were telling their most embarrassing moments and that precipitated her speaking about sexual abuse by Defendant. At first, Victim recanted her prior statements to A.A. but then confirmed that the sexual abuse had happened after N.P. Troy asked about her younger sister. N.P. Troy told Victim that she was worried that Victim could not protect her younger sister, then ten-years-old. At this point Victim began to cry and told N.P. Troy that it was not going to happen to her sister because she (Victim) was the only one Defendant calls into the room. N.P. Troy and Victim met with Mother; and, in front of Mother, Victim confirmed the sexual abuse. Mother had tear in her eyes. N.P. Troy diagnosed Victim with chronic child sexual abuse and prescribed treatment for Victim, which included counseling, blood work, and testing for HIV, hepatitis, and syphilis. However, Mother never brought Victim back to see N.P. Troy for follow-up care, testing, or counseling despite directives

to do so.[5]  Additionally, N.P. Troy requested to examine Victim's younger sister and provide counseling to the non-offending family members, which also did not occur.

While Victim's reports of abuse were consistent, her recantations of abuse were not. When asked why she lied to A.A., Victim provided various inconsistent motives behind making the initial disclosure to A.A.  At the 2018 trial, Victim testified as to various motives; however, she did not clearly confirm her motives for lying given to CAC Interviewer as to "bad grades" and given to N.P. Troy as to "embarrassing stories." Victim testified as to various concerns she had regarding her disclosure of rape against Defendant, including blaming herself for the pain the disclosure caused her family and for Defendant being removed from their home. Victim testified to these family concerns at trial, including her concerns for Defendant's safety and well-being in jail.

At trial, the State called as witnesses: A.A., Principal, Det. Augustus, Victim, Mother, D.D. Jr. (Victim's brother), and N.P. Troy as an expert and fact witness; and introduced the following evidence: Police BWC videotape, NOPD audio-recording, a portion of the DCFS Report, Victim's medical reports from N.P. Troy, Victim's school report card, and the 911 tape.

---

[5] The record does not reveal whether it was reported that Mother neglected to bring Victim to N.P. Troy's recommended treatment as required by La. Ch. C. art. 603 (18), which reads:  "(18) "Neglect" means the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary . . .  treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired. " La.Ch.C. art. 610 (A)(1) states in pertinent part:  "Reports of child abuse or neglect  . . ., where the abuser is believed to be a parent or caretaker, . . . , shall be made immediately to [DCFS]. . ."

The defense called Principal, Uncle and two character witnesses and introduced the following evidence: CAC videotape, N.P. Troy audio-recording, and Victim's school report card. Prior to trial, the district court denied Defendant's motions *in limine* to exclude the following evidence: hearsay statements in BWC videotape; "first reporter" hearsay to A.A.; Victim's medical record hearsay; and the 911 audio-recording hearsay.

## A. State's Fact Evidence and Trial Testimony

### 1. *Testimony of A.A.: Initial Disclosure of Sexual Abuse*

In the beginning of November 2016, Victim first disclosed allegations of sexual abuse by her father to her best friend, A.A. Victim and A.A. had been friends since grammar school and were then in seventh grade. A.A. had never known Victim to lie or do anything untrustworthy.

During recess at school, A.A. noted that Victim looked sad and dull. Victim told A.A. she had something to tell her but made A.A. promise she would not tell anyone. Once A.A. agreed, Victim told her that Defendant had raped her and that the rapes happened every Monday when Mother was at work. Victim started crying as she spoke. She said that the rapes had been occurring since fourth grade. A.A. was frightened for Victim. A.A. promised not to tell but could not keep the secret. A.A. initially told the assistant principal at their school one or two days later. The assistant principal took A.A. to see Principal. A.A. told Principal about Victim's statements to her that she was being sexually abused by Defendant. A.A. also

8

testified that she saw Victim in the schoolyard with a piece of paper that Mother and Uncle made her rehearse that said that she had lied to A.A. and others about Defendant abusing her. Victim told A.A. that she (Victim) had to remember it or she would get in trouble with Mother.

A.A. testified that she and her mother met with a male detective one or two weeks after Victim's disclosure and told him about Victim's rehearsing on the playground. A.A. testified that she was truthful and told him everything she knew because she didn't want this to happen to Victim again or to Victim's siblings. She and Victim were not really friends anymore. They went to different schools, and Victim's mother made Victim block A.A. on Instagram.

## 2. *Testimony of Principal*

On November 4th, after speaking with A.A., Principal called Victim to her office and asked her about what she had told A.A.[6] Victim confirmed what she had said to A.A. and further stated that Defendant would tell her three younger siblings to go into another room to do homework while Victim cleaned with Defendant. Defendant then instructed her to go into his bedroom, lay on the bed, and take off her clothes. He would "put his private parts on her private parts, " which Victim confirmed meant intercourse.[7] Victim said this had been going on for several years and on Mondays because no other adult was home. Victim also claimed Defendant

---

[6] Although the record is somewhat unclear, it appears that the assistant principal was present in Principal's office during the afternoon of November 4th; the assistant principal did not testify at trial.

[7] Victim said to Principal that Defendant "put his privates on her privates." At some point later, Principal asked Victim, if she was "talking about intercourse," to which Victim said yes.

physically abused her and her siblings.[8] Victim was an honor roll student who only had a few bad grades during the time she disclosed the abuse, but they improved once Defendant was removed from the home.

Principal spoke to Victim on numerous occasions following November 4th to check in and make sure she felt safe. She told Victim that if she needed to talk to someone, she could come to her. Principal even gave Victim her cell phone number and told Victim that she could call at any time. Despite these frequent encounters, Victim never told Principal that she had lied about the sexual abuse.

Principal never doubted what Victim told her on November 4th, stating that Victim had never been untruthful with her in the past. As principal, she had extensive experience with children and was often called upon to decide whether a child was being honest or dishonest.

Mother came to see Principal a couple of times after the disclosure. It was Principal's impression that Mother seemed more concerned about herself as a parent than about Victim. At one point, Mother asked what she could do to get "dad out of this situation." In response, Principal said that "she would have to prove that dad was innocent[.]"

Following Victim's confirmation of abuse, Principal called 911, an audio of which was identified by Principal and played for the jury. In addition, Principal called DCFS.

### 3. *BWC Videotape Interview*

---

[8] Principal stated that other teachers had observed signs of neglect with Victim's siblings in the past.

Sgt. Lacey arrived at the school and briefly interviewed Victim in the Principal's office, which interview was captured on the BWC videotape. The BWC videotape was shown to the jury and entered into evidence through the testimony of Principal who was present while the interview took place. At various times, Principal identifies herself in the BWC videotape.

Victim is seen and heard telling Sgt. Lacey that Defendant "touches me in my private parts," and in response to the question, "How long had this been going on?" Victim said, "Maybe since I was about eight."

### 4. *Testimony of Det. Augustus and Audio-recorded Interview*

Det. Augustus responded to the complaint of aggravated rape lodged by Principal. Det. Augustus testified that he conducted an interview with Victim in Principal's office.[9] Det. Augustus conducted a brief "exigent interview," to determine whether Victim would be exposed to the same abuse if she was returned to the home or Defendant. The interview was recorded and played for the jury.

Victim specifically told Det. Augustus that Defendant put his "privates in her privates." Victim said this occurred on October 24th and Defendant attempted again on November 1st. Victim again stated that Defendant would send the other children to a different room and then tell her to go into his bedroom and take off her clothes, at which time the sexual abuse would take place. Victim affirmed that the abuse occurred on Mondays, when both Mother and Uncle were at work.

---

[9] Before the arrival of Det. Augustus, Victim's siblings had been brought to Principal's office. However, before Det. Augustus began his recorded interview of Victim, her siblings were sent into another room.

Det. Augustus wanted to speak with Mother to get more information. However, Mother was "very evasive," and he was unable to meet with her. He also had no opportunity to speak with Victim's siblings to corroborate that they were instructed to go into another room while Victim cleaned with Defendant.

Det. Augustus spoke about an interview he had with A.A. on December 14, 2016, at which time they discussed Victim's first disclosure in the beginning of November. She also told him that she had seen Victim practicing a recantation statement given to her by Mother and Uncle. Det. Augustus never told A.A. that Victim recanted during the CAC interview.

5.    *DCFS Report*

Later on the afternoon of November 4th, DCFS Caseworker Martinez came to Victim's school to interview Victim, Victim's siblings, and Mother, who had been called to the school from her workplace. The interviews took place in Principal's office.[10]

Victim told Martinez that Defendant had been sexually assaulting her on Mondays since she was eight years old. Victim stated that her other siblings were told to go into a separate room while she helped Defendant clean. Defendant would then tell her to change into a skirt and touch her. She did not think Defendant had done it to her younger brothers or sister. Victim also alleged that Defendant physically abused her and her siblings.

---

[10] State's Exhibit 2 consists of two pages (pages 8 and 10 of 15) from Martinez's DCFS report and reflects interviews of Victim, Victim's younger brother, D.D., Jr., and Mother. It was entered into evidence as an inconsistent statement used to impeach Victim's credibility at trial and to refresh the memory of D.D. Jr., who also testified. The exhibit does not indicate who was present when each interview took place.

Martinez spoke to Mother, who he stated "appeared to be in disbelief and denial." He reported that Mother stated that her husband "never did that." He noted that Mother began to cry during the interview. Martinez also spoke to D.D., Jr., then eight-years-old, who stated that "they [the other three children] are placed in a different room when [Victim] clean [sic] up…Dad tells [Victim] what to clean up."

### 6. *December 2nd Videotaped CAC Interview*

On December 2nd, CAC interviewer spoke with Victim, at which time Victim recanted her previous statements. Det. Augustus was present at the CAC during the interview in another room. He was able to see the interview on a monitor and communicate with CAC interviewer through a microphone connected to an earpiece worn by CAC interviewer. Before beginning the interview, CAC interviewer asked Victim if she had any fears that day and Victim replied "I'm scared I might say the wrong thing."[11]

When asked about the initial disclosure, Victim said she was receiving failing grades and her best friend, A.A., noticed. When A.A. asked about it, Victim said something that got Defendant in trouble; but she didn't mean to get Defendant in trouble and had lied about him touching her. She told CAC interviewer that Defendant said if they (she and her siblings) got bad grades, he would make them all leave and not come back. She told A.A. that he touched her on Mondays because he was home on that day. She had to make something up, so she said that

---

[11] The videotaped interview was entered into evidence through the testimony of Det. Augustus and played for the jury. During his redirect examination, Det. Augustus was asked several questions about what was heard on the video.

he made them all clean but would send her siblings into another room to do homework and tell her to change into a skirt and touch her in his bedroom. Victim stated that she was getting a lot of bad grades at the time; however, Det. Augustus later checked with Principal and was told that Victim was an honor roll student.

Victim stated that she did not know A.A. would tell Principal. When Victim spoke to Principal, she continued the lie. Victim asked Principal what would happen next and was told that Defendant would have to move out. Victim was sad about that but did not want to get in trouble for lying. Victim told the same story to the police officer who first arrived at the school and to the investigator who arrived later. At some point, all her siblings were called to the office and Mother arrived. Another person came and asked them all questions. When they returned home, Defendant had left the house and was staying with his mother.

Victim talked to Mother about what she told A.A., Principal, and the police officers about the sexual abuse by Defendant. Mother said she was lying. Victim admitted she lied but did not know that she would get Defendant in trouble. Mother said that she did not believe what Victim said and knew that Defendant would not do that. Victim agreed but said she lied because she was scared. Mother told her that she needed to tell the truth.

### 7. *Testimony of N.P. Troy and December 14th Medical Examination, Records, and Audio-recording*

On December 14, 2016, Mother brought Victim to the CAC. N.P. Troy conducted a recorded incident history with, and medical examination of, Victim, that was facilitated by a Vietnamese-to-English translator to communicate with

14

Mother, who does not speak English. Mother was not present in the room when N.P. Troy spoke to Victim. N.P. Troy developed an initial rapport with Victim by discussing her school and friends and explained the medical examination to be performed. Initially, Victim recanted her statement that Defendant had sexually abused her despite the referral N.P. Troy received indicating a clear disclosure of abuse. Victim said she and her best friend, A.A., were talking about their most embarrassing moments when Victim made the accusation against Defendant.

Victim was not initially forthcoming with information other than what she told A.A. She also made comments that Mother was very sad, worried about money, concerned about not being able to go to Vietnam, and that Victim was afraid Defendant would go to and get beat up in jail. It was around this time that the recorder was turned off.[12]

N.P. Troy then told Victim that she (N.P. Troy) was worried that Victim could not protect her younger sister, then ten-years-old. At this point Victim began to cry and replied, "It's not going to happen to her. I'm the only one he calls into the room."[13] Under cross-examination, N.P. Troy explained that she did not turn the tape recorder back on because Victim was sobbing at this point. N.P. Troy thought it was more important that she help Mother see that Victim was telling the truth about the sexual abuse.

---

[12] The jury heard this recording. During N.P. Troy's cross-examination, the recording was played and she was questioned about its contents.

[13] N.P. Troy, while on the witness stand, read to the jury the medical records entered into evidence.

When N.P. Troy asked Victim about the disclosure to A.A., Victim confirmed that the sexual abuse had happened. N.P. Troy asked Victim if she felt some pressure that scared her, and Victim replied in the affirmative. N.P. Troy and Victim met with Mother and explained the situation. In front of Mother, N.P. Troy asked Victim, "Did that happen one time or more than one time," to which Victim replied, "It's true. It happened more times." Mother had tears in her eyes. N.P. Troy then received permission from Mother to perform a physical examination of Victim.

N.P. Troy diagnosed Victim as having chronic child sexual abuse. N.P. Troy's written evaluation, memorializing her findings during her incident history of Victim, indicates as follows:

> [Victim] was seen today for concerns for sexual abuse after disclosing to her friend at school and teachers that her dad had touched her. Today she provided a history that she and her friend, [A.A.], were telling each other their most embarrassing moments. This precipitated her speaking about the abuse by her dad.

> [Victim] talked through most of the incident history about fear that dad would get beat up in jail, the siblings wouldn't have a dad and her mom's very sad. [Victim] cried during the incident history tears down her face while she continued to recant the sexual abuse that she first disclosed to her best friend and then the school principal.

> After the tape was turned off she was offered this provider's card and asked to call here if it happens again. Rather than state again a recantation, she cried, shook her head, 'Yes. ' When asked how she knew it didn't happen to her younger sister she replied, 'Because dad doesn't call her away privately to his room as he does me. '
> . . . When [Victim] was asked if it happened one time or more than one time, she held her head down and said, 'More. '

N.P. Troy's medical records were admitted into evidence and published to the jury subject to Defendant's objection.

16

N.P. Troy further noted Mother was at risk of denial, even after hearing Victim verify several instances of assault, because the family was financially dependent on Defendant. Mother never brought her back to see N.P. Troy for follow-up care, tests, or counseling, despite directives to do so.

**8.** ***March 20, 2018 Trial Testimony of Victim***

Victim testified that Defendant was off on Mondays and that both Mother and Uncle worked that day. Victim could not remember the exact day she made her disclosure to A.A. She denied that any sexual abuse ever took place, stating she lied to A.A., Principal, and the police officers; and stated that what was said by her or her siblings in the DCFS was untrue. Victim admitted telling the assistant principal and a police officer that Defendant had been raping her on Mondays for a long time, but that was a lie she had to tell so she would not get into trouble for what she originally told A.A.

After A.A. told Principal of the sexual abuse, Mother was called and Mother removed Victim and her siblings from school. Mother's initial reaction was to ask Victim if what she said about Defendant was a lie. Victim replied, "Yes, I'm lying… I didn't want to get in trouble." Mother told her to tell the truth the next time. However, after reading the statement she made to the police officers, Victim once again said she lied and also said that if her siblings said that Defendant physically abused them, they too were lying. Victim admitted that she might have told A.A. that Defendant hit them with a flashlight and a fishing pole, but that was also a lie.

Victim recalled speaking with N.P. Troy with a Vietnamese translator present but told N.P. Troy that she lied to A.A. Under further questioning, Victim could remember very little of her interview with N.P. Troy. When asked questions

about her interview with N.P. Troy, she mainly responded, "I don't remember; I really don't remember." Victim said she never intended to get Defendant into trouble and did not realize that what she told A.A. and the police would destroy her family and cause Defendant to be removed from their home.

Victim offered various reasons to explain why she made up the story, including: (1) to see if A.A. would believe her; (2) to see if she could trust A.A. or if A.A. would tell other people; (3) to test A.A.'s friendship; (4) she did not feel Defendant loved her because he would stay in his room all the time watching his computer and "he would like make us work hard and I thought it was just to see us suffer. And he said that he would bring us to Vietnam if we didn't do good and that made me feel that he didn't want us anymore;" (5) she did not think Defendant liked her; and (6) she did not want Defendant around.

Although she admitted that she was testing A.A. by telling her about Defendant, she told so many other people it happened because she didn't want to get in trouble for lying. She also lied about the physical abuse she said Defendant inflicted upon her and her siblings.

Victim, however, provided conflicting testimony that she made up the allegations because she and A.A. were exchanging embarrassing stories or she was failing school. She gave conflicting testimony, testifying that she does not remember telling N.P. Troy that she was exchanging embarrassing stories with A.A., but says that she thinks they were sharing embarrassing stories but does not really remember. When asked, "Okay. And the reason you told her [A.A.] was not because you were failing school because you never were?" She responded "No." Victim agreed that she was making mostly "A's" and some "B's" and was on the

honor role. She told Mother that she had lied and that her siblings had lied about being separated from her while they cleaned.

Victim never wanted to get Defendant in trouble. Now her brothers and sister keep asking her where Defendant went. She did not know the effect this would have on her family and never meant for all this to happen. Victim stated that she felt as if this was all her fault, despite what she was told by N.P. Troy, because it made Defendant go away and her "brothers and sister don't have my dad here to hug them."

Victim admitted that she would say anything so Defendant would not get in any more trouble. When she told A.A., she asked A.A. to keep it a secret because she did not want to see what was happening now; so she told the person she trusted most. She asked A.A. to keep it a secret "because I was trying to see if it like made sense and if she would be my friend and if I could actually trust her."

She stated that she met with Defendant's attorneys prior to trial but that they never told her what to say.

### 9. Testimony of Victim's Brother

D.D., Jr., Victim's younger brother, then ten-years-old, testified consistently with what he had told the DCFS caseworker two years earlier. He stated that Defendant would send all the children but Victim into a separate room to do homework while Victim cleaned with Defendant. They were told to remain in the other room. D.D., Jr., stated that this happened frequently. However, D.D., Jr., denied Defendant was mean or physically abusive to him.

### 10. Trial Testimony of Mother

Mother confirmed that she worked on Mondays and had worked on October 24, 2016. When she spoke to Victim about her accusations, Victim said that she had lied. Mother knew her children, stating "I know she's lying."

When asked why Victim cried during her medical examination at Children's Hospital, Mother said she did not know and did not ask Victim. When asked about Victim's disclosure to N.P. Troy, Mother stated, "that I don't remember because she was crying and I was crying, so I don't remember." She admitted that she cried after Victim's interview with N.P. Troy, because, being a mother, she cries when one of her children cries. She never brought Victim back for another physical examination because no one called her. She neither got counseling for Victim nor did she and Victim meet with anyone from the District Attorney's office. Mother would have allowed Victim to meet with the District Attorney's office, but the interpreter who called Mother to set up a meeting threatened Mother and she was scared, causing Mother to hire her own lawyer. Mother did, however, permit Victim to meet and speak with Defendant's attorneys on more than one occasion.

**B. Defense Fact Evidence and Trial Testimony**

1. *Testimony of Principal and Victim's Report Card*

Principal was recalled to briefly discuss Victim's grades as reflected in her progress reports for the first two quarters of 2016. These reports indicated that Victim was receiving "D's" in both English and Reading. However, Principal testified that for the last two years at the school, Victim was an honor roll student.

2. *Testimony of Uncle*

Uncle lived with Defendant and his family for approximately ten years. During that time, Uncle never saw Defendant abuse or hit his children. Defendant was a good father and helped his children with their homework.

Uncle would usually arrive home after work between 5:10-5:30 p.m. He neither saw anything strange between Defendant and Victim nor did Victim seem upset. Uncle did not believe the allegations Victim made against Defendant, so he spoke to Victim. She told Uncle that she had lied. Since all this had happened, however, Victim often appeared sad. He never asked her why she was sad but Victim was not sad before Defendant went away.

When Uncle returned home on October 24, 2016, he could see that Defendant had been working on his car the whole day. He confirmed that Defendant did not work on Mondays. Finally, Uncle denied that he gave Victim any type of "script" to rehearse in order to recant her story.

### 3.  *Testimony of Character Witnesses*

Two character witnesses who had known Defendant for a number of years testified on his behalf. Both of them trusted Defendant, had never seen Defendant mistreat any of his children, and felt comfortable leaving their own children with him. One witness testified that he had seen Victim with Defendant and she seemed happy around her father. One of the witnesses, Defendant's co-worker, confirmed that Defendant did not work on Mondays.

After a two-day trial on March 21-22, 2018, a unanimous jury found Defendant guilty on two counts of first degree rape in which one occurred on October 24, 2016; one count of attempted first degree rape; and one count of sexual battery occurring on November 1, 2016.  After denying Defendant's motions for new trial, in arrest of judgment, and to reconsider sentence, the district court sentenced Defendant.

Defendant filed this timely appeal.

After reviewing the record and the applicable law, and for the reasons that follow, I affirm Defendant's convictions and sentences.

## II.  ERRORS PATENT

A review for errors patent on the face of the record reveals none.

## III.  ASSIGNMENTS OF ERROR

Defendant has assigned the following errors for our review:

1.  The verdicts are contrary to the law and the evidence;

2.  The district court improperly denied the motion *in limine* to exclude the BWC videotape footage;

3.  The district court improperly denied the motion *in limine* to exclude hearsay from the first reporter, A.A.;

4.  The district court improperly denied the motion *in limine* to exclude N.P. Troy's medical records;

5.  The district court erred in the denial of the motion for new trial because the convictions were the result of improper use of prior inconsistent statements; and

6.  The district court erred by allowing two of the State's witnesses to give factual testimony in violation of La. C.E. art. 704 (N.P. Troy) and La. C.E. art. 701(Principal).

## IV.  DISCUSSION

### A.  Sufficiency of the Evidence: Assignment of Error Number 1

In his first assignment of error, Defendant argues that the evidence is insufficient to support his convictions of first degree rape, attempted first degree rape, and sexual battery.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the State and to support the verdict, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443

U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed. 2d 560 (1979); *State v. Tate,* 01-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928; *State v. Reel*, 10-1737, p. 7 (La. App. 4 Cir. 10/3/12), 126 So.3d 506, 513, *writ denied*, 12-2433 (La. 4/12/13), 111 So.3d 1018.

The essential elements of the crimes of which Defendant was found guilty beyond a reasonable doubt are found in the following statutes. First degree rape includes "a rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed . . . [w]hen the victim is under the age of thirteen years. " La. R.S. 14:42(A)(4). La. R.S. 14:27, the attempt statute, provides in pertinent part:

> A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
> * * *
>
> C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.

Sexual battery includes "the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing," when "the victim has not yet attained fifteen years of age and is at least three years younger than the offender." La. R. S. 43.1(A)(2).

A reviewing court is guided by the following key principles pertaining to a sufficiency of the evidence review: (1) All evidence in the record must be reviewed, including expert testimony, *State v. Hearold*, 603 So.2d 731, 734 (La. 1992); (2) great deference is given to the jury's findings of fact and weighing of the evidence, *State v. Clements*, 15-0630, p. 7 (La. App. 4 Cir. 5/4/16), 194 So.3d 712, 717; (3) all evidence, both direct and circumstantial, must be reviewed in the light most favorable to the State and in support of the verdict, *id.*; and (4) reversal of a conviction is warranted only when the evidence is insufficient because the jury's decision to accept and give great weight to an essential finding of fact is irrational, clearly contrary to the evidence, based on implausible evidence, and found to have internal contradictions or irreconcilable conflicts with the evidence, *see id., 15-0630, p.8, 194 So.3d at 717*; *State v. Mussall*, 523 So.2d1305, 1311 (La. 1988); *State v. Armstead,* 14-0036, p. 12 (La. App. 4 Cir. 1/28/15), 159 So.3d 502, 512.

First, under a sufficiency of the evidence analysis, the reviewing court must consider all of the evidence in the record, including expert testimony on the dynamics of child sexual abuse and violence.[14] Expert testimony can assist a trier of fact in understanding the significance of a child-witness's demeanor, inconsistent reports, delayed disclosure, reluctance to testify, recantation, and other

---

[14] Expert testimony becomes problematic when it is unduly prejudicial, when it invades the province of the jury, when it bolsters a child-witness's testimony, or when it leads to a "battle of the experts." *State v. Chauvin,* 02-1188, p. 8 (La. 5/20/03), 846 So.2d 697, 702. Also, under a sufficiency of the evidence analysis, the reviewing court must consider any evidence, which may have been erroneously admitted at the trial, such as unreliable inadmissible hearsay or relevant, or nonhearsay evidence, which is unduly prejudicial. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Hearold*, 603 So.2d 731, 734 (La. 1992). Hearsay testimony becomes problematic when its admission is erroneous and not a harmless error; whereas, nonhearsay and relevant evidence becomes problematic when it is unduly prejudicial and lacks probative value. These problematic concerns are fully addressed in the discussion on the admissibility of expert testimony and are separate from a sufficiency of evidence analysis. *See infra* Section B on Admissibility of Evidence.

post-trauma behavior, as explained in *State v. Chauvin,* 02-1188 (La. 5/20/03), 846 So.2d 697.[15] The Louisiana Supreme Court recognized the significance of certain expert testimony in child sexual abuse cases, including recantation cases:

> We begin by noting that child sexual abuse cases are not easy to prosecute. Dara Loren Steele, Note, *Expert Testimony: Seeking an Appropriate Admissibility Standard for Behavioral Science in Child Sexual Abuse Prosecutions,* 48 Duke L.J. 933, 938 (1999). Child sexual abuse is difficult to prove because it most often occurs in private, often the perpetrator is a member of the victim's family, and physical evidence of the abuse is rare. *Id.* The problems with prosecuting child sexual abuse cases are increased by the fact that most children fail to report the abuse, and, if they do report, there is often a significant lapse in time between the actual occurrence and the ultimate reporting of the abusive incident by the child. *Id.* pp. 938-939. Even then, the child may not include details in her revelation and often children recant or alter their allegations of abuse. *Id.*, p. 939.
>
> Expert testimony can assist a trier of fact in understanding the significance of a child-witness's demeanor, inconsistent reports, delayed disclosure, reluctance to testify, and recantation. Veronica Serrato, Note, *Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses,* 68 B.U. L.Rev. 155, 156 (1988). An expert witness can explain to jurors that a child-witness's seemingly abnormal behavior-delayed reporting, inconsistent statements, and recantation-is in fact normal for children who have been sexually abused and can also dispel inaccurate perceptions held by jurors, allowing them to better assess a child-witness's testimony. *Id.* p. 163.

*Chauvin*, 02-1188, pp.8-9, 846 So.2d at 702-703.

The Louisiana Courts of Appeal have all recognized the usefulness and admissibility of expert testimony in child sexual abuse cases, which assists jurors

---

[15] *See also State v. Foret,* 628 So.2d 1116, 1130- 31 (La. 1993) (where the Court found that "inadmissible expert testimony served to unduly bolster [the] testimony, and in all probability, made it much more believable to the jury;" however, "evidence should be admissible only for the limited purpose of explaining, in general terms, certain reactions of a child to abuse that would be used to attack the victim/witness' credibility.")

in their assessment of the credibility of a child's testimony and in their understanding of the behavior of a child victim witness. *See, e.g., State v. Alfaro,* 13-0039 (La. App. 5 Cir. 10/30/13), 128 So.3d 515, 521 (expert testimony can assist a jury in understanding the significance of a child-witness's demeanor, inconsistent reports, delayed disclosures, and recantation and by dispelling jurors' inaccurate perceptions allowing them to better assess a child-witness's testimony; "[C]hildren recant for a variety of reasons, such as fear and threats, and that child victims may recant after seeing 'the consequences or reactions of the people around them.'"); *State v. Banks,* 17-0358, p. 15 (La. App. 5 Cir. 3/14/18), 241 So.3d 1240, 1249 (An expert witness can explain to the jury that a child-witness's seemingly abnormal behavior and dispel jurors' inaccurate perceptions of child victims); *State v. McClendon*, 17-0160, p. 7 (La. App. 4 Cir. 9/27/17), 228 So.3d 252, 257 (disclosure of the molestation by a child is a very difficult process because the abuser is often a person the child knows and loves); *State v. V.L.G.,* 11-634 (La. App. 3 Cir. 12/7/11), ---So.3d---, 2011 WL 6077831 *14 (*unpub.*) (where the court held that expert gave a description of general behavioral traits in sexually abused children and testified that recantation and delayed reporting of certain events were not atypical for any child who had been sexually abused and that, therefore, under *Chauvin* and *Foret,* the testimony was admissible.); *State v. Lewis,* 50,546, p. 4 (La. App. 2 Cir. 5/4/16), 195 So.3d 495, 497-98 (where the court allowed expert testimony that in most cases where victim is a minor, there are no medical or physical signs of sexual abuse); *State v. Grandison,* 18-0046, p. 11 (La.App. 1 Cir. 11/5/18) ---So.3d. ---, 2018 WL 5785333 *5 (*unpub.*) (where court allowed expert testimony to explain to jury why a victim may experience naïveté, confusion, embarrassment, shame, fear and self-guilt).

In the case *sub judice*, similar expert testimony was introduced, without objection by the defense,[16] to assist jurors in their assessment of the credibility of Victim's testimony. The district court, upon the stipulation of the defense, qualified N.P. Troy as an expert in the field of child sexual abuse and delayed disclosure. N.P. Troy provided substantial background as to her training and experience as a long-time forensic medical examiner and court-qualified expert in those fields. Expert testimony by N.P. Troy explained to jurors that certain behaviors of a child-witness may not be what is expected; that general characteristics of a child sexual victim that explain delayed reporting and recantations have been found; and that seemingly abnormal behavior— delayed reporting, inconsistencies, and recantation— is in fact normal for children who have been sexually abused and can also dispel inaccurate perceptions held by jurors, allowing them to better assess a child-witness's testimony. N.P. Troy testified that disclosure of sexual abuse by a child is a very difficult process because the victim usually knows and loves the abuser and is not always sure what is happening or why. Feelings of shame, embarrassment, guilt, and other external factors— like fear that no one will believe them, that they may be punished, that their security will be threatened, or concerns for family members including the accused— contribute to the dynamics of child sexual abuse disclosures. N.P. Troy explained that the persistence of attachment behavior, in which child sexual abuse victims often have an attachment to the parents who abused them, is a behavior often not expected. She testified that protective factors, such as the development of a good support system and post-disclosure counseling for a victim and non-

---

[16] Defense did not object to the expert testimony of N.P. Troy under a La. C.E. art. 702, *Chauvin, Foret,* or *Daubert* analysis. Defendant's assignment of error number six addresses the admissibility of a portion of N.P. Troy's testimony under a La. C.E. art. 704 analysis.

offending family members, are important in the treatment of a victim of familial child sexual abuse. N.P. Troy stated, "I approach the non-offending parent with the idea that if I don't send home a parent who is protective of this child and understanding of what I understand, then the child is at great risk to be silenced, not to get the counseling and to ultimately be re-victimized."

Second, a reviewing court must give great deference to the jury's review of the evidence, findings of fact, and weighing of the evidence. The appellate court does not assess the credibility of witnesses or reweigh evidence.[17] "Credibility determinations, as well as the weight attributed to the evidence, are soundly within the province of the fact finder."[18] Conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency.[19] In determining credibility, triers of fact usually are assisted by their opportunity to observe the witness' demeanor under oath and to evaluate the witness' testimony under cross-examination. Evidence from other sources adduced at the trial also assists the trier of fact in determining the credibility of the witnesses.

"A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part."[20] "Where the testimony of a witness is impeached in part, the trier of fact has discretion to accept those portions of testimony deemed credible."[21] For a sufficiency review in cases of sexual

---

[17] *State v. Smith*, 94-3116, p. 2 (La. 10/16/95), 661 So.2d 442,443.

[18] *State v. Scott*, 12-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508.

[19] *State v. Moffett,* 17-0769, p. 4 (La. App. 4 Cir. 6/13/18), 247 So.3d 908, 911.

[20] *State v. Turner*, 16-0230, p. 7 (La. App. 4 Cir. 10/19/16), ---So.3d---, 2016 WL 6094507 *3 (*unpub.*); *State v. Bass,* 51,411, p. 10 (La. App. 2 Cir. 6/21/17), 223 So.3d 1242, 1247, *writ not considered,* 18-0296 (La. 4/16/18), 239 So.3d 830.

[21] *State v. Marshall,* 04-3139, p. 7 (La. 11/29/06), 943 So.2d 362, 368.

offenses where a victim recants at trial, prior reports of sexual abuse by a victim, accepted by the juror as credible after considering the totality of the circumstances surrounding the reports and recantations, can be sufficient to establish the elements of a sexual offense, even where there is no physical evidence, such as DNA or physical injury, to prove the commission of the offense.[22] When a district court makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not disturb those findings unless there is no evidence to support them. *State v. Thomas,* 11-0915, pp.13-14 (La. 5/8/12), 93 So.3d 553, 563; *State v. Wells*, 08-2262, p. 5 (La. 7/6/10), 45 So.3d 577, 581; *State v. Parks*, 14-497, p. 11 (La. App. 5 Cir. 11/25/14), 165 So.3d 930, 936-37 ("Although [the witness] later recanted at trial, it is the role of the fact-finder to weigh the credibility of witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. ")

Third, all of the evidence, direct and circumstantial, is viewed in the light most favorable to the State. *Clements*, 15-0630, p. 7, 194 So.3d at 717. Thus, a

---

[22] *See, e.g., State v. Alfaro*, 13-39, p. 13 (La. App. 5 Cir. 10/30/13), 128 So.3d 515, 524, *writ denied,* 13-2793 (La. 5/16/14), 139 So.3d 1024 (where court found that even though there was no physical evidence of sexual abuse and the victim recanted her previous reports of abuse at trial, the jury clearly gave credence to the victim's prior statements and interviews and discredited her trial recantation testimony, which was within the jury's sound discretion)*; State v. Celestine*, 17-275, p. 8 (La. App. 5 Cir. 11/29/17), 232 So.3d 105, 111, *writ denied,* 18-0066 (La. 11/5/18), 256 So.3d 275 (where court found that although victim recanted her previous reports of abuse at trial, the evidence was sufficient to support defendant's conviction for oral sexual battery); *compare* with cases involving trial testimony of abuse (*State v. Clements*, 15-0630, p. 8 (La. App. 4 Cir. 5/4/16), 194 So.3d 712, 717, *writ denied,* 16-1609 (La. 5/12/17), 220 So.3d 830 (where this Court observed that "the jury may accept as true the testimony of any witness"); *State v. Reel*, 10-1737, p. 8 (La. App. 4 Cir. 10/3/12), 126 So.3d 506, 513 (*citing State v. Hotoph,* 99-243, p. 13 (La. App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045) (where court found in the case of sexual offenses, the trial testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the state does not introduce medical, scientific or physical evidence to prove the commission of the offense); s*ee also Chauvin,* 02-1188, p. 8, 846 So.2d at 702 (where Court noted that "physical evidence of abuse is rare" in child sexual abuse cases).

reviewing court is not limited to the evidence itself, but may consider all reasonable *inferences* from the evidence, which the fact-finder could have made. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Clements*, p. 7, 194 So.3d at 717.[23] "When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *State v. Johnson*, 99-1053, p. 5 (La. App. 4 Cir. 6/14/00), 766 So.2d 572, 577. This is not a separate test from *Jackson* standard, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. *Id*. Moreover, in cases involving circumstantial evidence, when the jury reasonably rejects the hypothesis of innocence advanced by the defense [in the case *sub judice*, Defendant's hypothesis of innocence is that Victim lied to A.A.], "that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Jones*, 16-1502, p.5 (La. 1/30/18) ---So.3d----, 2018 WL 618433 *3 (quoting *State v. Captville*, 448 So.2d 676, 680 (La. 1984)); *State v. Francois*, 03-1313, p.4  (La. 4/14/04), 874 So.2d 125, 128.

---

[23] Evidence is either direct or circumstantial. *State v. Hernandez*, 14-863, p. 12 (La. App. 5 Cir. 9/23/15), 177 So.3d 342, 351, *writ denied,* 15-2111 (La. 12/5/16), 210 So.3d 810. Direct evidence is evidence, which, if believed, resolves a matter in issue. 1 *McCormick on Evidence,* § 185, p. 777 (John W. Strong ed., 4th ed. 1992).  "Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *Hernandez*, 14-863, p. 12, 177 So.3d at 351 (*quoting State v. Shapiro,* 431 So.2d 372, 378 (La. 1982)).  In instances involving circumstantial evidence, La. R.S. 15:438 dictates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Id.*  Circumstantial evidence may also be testimonial, but even if the circumstances depicted are accepted as true, additional reasoning is required to reach the proposition to which it is directed. 1 *McCormick on Evidence,* § 185, p. 777.

Fourth, reversal of a conviction as evidentiary insufficient is warranted when the jury's decision to accept as true a victim's initial disclosure of sexual abuse and to reject as false a victim's recantations is irrational, clearly contrary to the evidence, based on implausible evidence, and found to have internal contradictions or irreconcilable conflicts with the evidence.[24]

Louisiana appellate courts have affirmed the conviction of child sexual abuse and domestic violence involving disclosures of abuse followed by a trial recantation based on the jury's decisions to believe the disclosures of abuse and discredit the victim's recantations finding the jury's verdict to be rational based on the surrounding circumstances and sufficient to find the defendant guilty of the abuse beyond a reasonable doubt. *See, e.g., Alfaro,* 13-39, p. 13, 128 So.3d at 524 (where the evidence presented was sufficient to support the conviction of the defendant/stepfather of the victim finding that the jury's decision to discredit the victim's trial recantation was reasonable and sufficient to find the defendant guilty beyond a reasonable doubt of aggravated rape and molestation of a juvenile); *Rankin,* 42,412, p. 9, 965 So.2d at 951 (holding that victim's prior inconsistent statements regarding her assailant, which were admitted both for impeachment purposes and their assertive value, supplied sufficient evidence for defendant's conviction); *State v. Celestine*, 17-275, p. 8 (La. App. 5 Cir. 11/29/17), 232 So.3d

---

[24] *See also State v. Finch,* 31,888, p. 6 (La.App. 2 Cir. 5/5/99), 733 So.2d 716, 727-28 ("Determination of credibility of witnesses is within the sound discretion of the trial court, and, like all questions of fact, is entitled to great weight and will not be disturbed unless clearly contrary to the evidence.... It is the function of the trier of fact to assess credibility and resolve conflicting testimony, and where the trier of fact has made a rational decision, it should not be disturbed on appeal.... In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for the requisite factual conclusion") (citations omitted). Thus, I will *only* tread on a jury's presumed acceptance of a witness' testimony when that testimony is implausible or clearly contrary to the evidence. *See State v. Mussall,* 523 So.2d 1305, 1311 (La. 1988); *see also Clements,* 15-0630, p .8, 194 So.3d at 717.

105, 111, *writ denied,* 18-0066 (La. 11/5/18), 256 So.3d 275 (finding that where the defendant relied on the victim's trial testimony that she previously lied to investigating officers and made up the allegations against him, the evidence still showed that although the victim recanted her allegations at trial, she also reported the incident to her grandmother, her best friend, and to the anonymous individual who initially contacted the police to report the incident).

Applying these standard-of-review principles and the applicable jurisprudence, I find no basis for reversal relative to my sufficiency of the evidence review. I find no merit in Defendant's argument that reversal is required because at trial Victim recanted her allegations of abuse.

Victim's recantation at trial requires a credibility determination in light of the State's evidence demonstrating Defendant's guilt, including Victim's videotaped and audio-recorded statements describing the incidents of sexual abuse Defendant perpetrated against her and the testimony of A.A.; Principal; Det. Augustus; D.D., Jr.; N.P. Troy; and others, including the testimony of Victim as to her admission of the disclosures of rape and her explanation of the surrounding circumstances of the disclosures and recantations. A jury has the prerogative to choose what evidence to believe as truthful and what to reject as untruthful. *State v. Pier*, 19716 (La. App. 2 Cir.8/7/88), 530 So.2d 1253, 1262 (citing *State v. Watley*, 301 So.2d 332 (La. 1974)). When there is conflicting testimony about factual matters, "the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *State v. Materre*, 09-1666, p. 11 (La.App. 4 Cir. 12/8/10), 53 So.3d 615, 622. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. *State v. Gibson,* 15-0682, p.15 (La.

App. 4 Cir. 1/27/16), 186 So.3d 772, 781. I am constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. *See State v. Mitchell,* 99–3342, p. 8 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient.

Viewed to support the verdict, a rational trier of fact could conclude beyond a reasonable doubt that Victim's recantations were false, that Victim's expressed concerns for her mother, father, and siblings moved her to falsely recant, and that the lack of protective factors contributed to her false recantations. *See State v. Fontenot*, 16-226, p. 19 (La. App. 3 Cir. 11/2/16), 207 So.3d 589, 600 (where the court found the jury not only heard the evidence that corroborated the victim's initial statements but also discredited the victim's recantation at trial.)

Recantations have been found to be suspicious. *See State v. Hurst*, 17-0909, p. 18 (La. App. 4 Cir. 2/21/18), ---So.3d---, 2018 WL 992589 * 11 (*unpub.*) (where the district court and this Court found that "in light of all the testimony and evidence provided to this court, it is this court's opinion that [the witness]'s recantation is wholly uncorroborated, suspicious, and is undermined by the overwhelming evidence presented by the state"). Victim's statements and testimony following her attempts to recant were extremely inconsistent. She provided numerous excuses for why she accused Defendant of raping her, such as bad grades or telling embarrassing stories, which have been disproved by other witnesses or rejected by Victim.

Moreover, the recantation is made even more suspicious by virtue of the fact that Victim was not brought to counseling or blood testing, as prescribed by N.P.

Troy, but was brought to Defendant's counsel; Mother was very evasive of NOPD; Victim testified that she was worried about Mother, Defendant going to jail, and her siblings not having Defendant around; and her inconsistent reasons for disclosing the abuse.

The jury was not irrational in concluding Victim's recantations were false, motivated by familial pressures, and the result of a lack of protective factors. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. [25] *State v. Calloway*, 07–2306, pp. 1-2 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*).

Further, the verdict also indicates the jury credited Victim's disclosures of rape made near the time of the actual sexual offenses. Four witnesses testified that Victim told them Defendant raped her numerous times from the age of eight until she was twelve-years-old. Victim disclosed to A.A., Principal, Det. Augustus, and later N.P. Troy, that Defendant had sexually abused her. Two individuals trusted by Victim—Victim's best friend since grammar school, A.A., and Principal—

---

[25] *See State v. Trahan*, 11-1609, pp. 8-10 (La. 7/2/12), 97 So.3d 994, 998-99 (Court found the evidence to be sufficient at trial to affirm defendant's conviction where defendant did not testify at trial, and found that the jurors reasonably rejected the hypothesis of innocence proposed by defense counsel); *see also, State v. Falgout,* 15-0953, p. 19 (La. App. 4 Cir. 8/24/16), 198 So.3d 1232, 1242-43 (where defendant did not testify at trial and this Court found defendant "made no showing that the jury's finding is contrary to the evidence," and the State produced sufficient evidence for the jury to find beyond a reasonable doubt that defendant was guilty of attempted forcible rape).

In the instant case, Defendant did not testify as to his innocence or "hypothesis of innocence." Defense's hypothesis of innocence is that Victim was lying, she recanted, and, therefore, her recantation is truthful. The jury, as the finder of fact, was entitled at the close of the evidence to hold the defense accountable for its failure to introduce sufficient evidence in support of the hypothesis of innocence proposed by defense counsel. The jury reasonably rejected the hypothesis of innocence proposed by the defense due to the insufficient and incredible evidence produced in support.

testified that Victim told them Defendant had raped her multiple times. Both witnesses confirmed that Victim stated that the rapes occurred on Mondays when Mother and Uncle were at work and that Defendant would send her siblings to another room to clean while he made her disrobe, lie on his bed, and "put his privates on her privates." D.D. Jr., Victim's ten-year-old brother at the time of trial, testified that he and his siblings were sent to another room while Defendant took Victim to another part of the house to clean. N.P. Troy and Det. Augustus also testified that Victim told them Defendant had raped her "more than one time." Det. Augustus, like Principal, testified that Victim informed him the rapes would occur on Mondays, while Mother and Uncle were at work. Victim even supplied one of the dates, October 24, 2016, as a day when Defendant raped her, the week before the initial disclosure to A.A. In addition, Victim gave the same information to the DCFS caseworker. In reviewing the evidence, I cannot say that the jury's determination that Victim's disclosures of rape were true was irrational under the facts and circumstances presented to them. *See State v. Ordodi*, 06-0207, p. 14 (La. 11/29/06), 946 So.2d 654, 662. Despite Victim's recantation at trial, the jury chose to believe Victim's disclosures of rape.

Viewed in the light most favorable to the State, the evidence was sufficient to convince a rational trier of fact of Defendant's guilt. Despite the inconsistencies between Victim's trial testimony and her initial disclosures of abuse, the jury decided to accept the consistent portions of Victim's reports of the sexual abuse as corroborated by the State's witnesses and evidence.[26] Thus, I find Defendant's assignment of error one as to the sufficiency of the evidence lacks merit.

---

[26] *See State v. Armstead*, 14-0036, pp. 12-13 (La. App. 4 Cir. 1/28/15), 159 So.3d 502, 513 (where this Court, "[c]onstruing the evidence in the light most favorable to the prosecution,

## B. *Admissibility of Evidence: Assignments of Error Number 2, 3, 4, 5, and 6*

In these assignments of error, Defendant raises issues as to the admissibility of evidence. Defendant primarily complains that the district court committed reversible error when it admitted Victim's prior inconsistent statements that were inadmissible hearsay[27] evidence, such that their admission into evidence was not harmless error or was highly prejudicial admissible evidence and he was denied due process.

A reviewing court is guided by the following key principles pertaining to an admissibility of the evidence review. First, a district court's ruling on the admissibility of evidence will not be disturbed on appeal absent a clear abuse of the district court's discretion.[28] Second, only those errors that were objected to at trial or based on "the court's ruling on any written motion" are preserved for review.[29] ("[T]he contemporaneous objection rule contained in [La. C.Cr.P. art.

---

[found] that any rational fact-finder could conclude that Armstead was guilty beyond a reasonable doubt of carnal knowledge of a child victim. At trial, Armstead sought to cast doubt upon the State's case by pointing out inconsistencies in the versions of events related by the victim to nurses and detectives. To the extent Armstead's endeavors were successful, we note that the jury was presented with a factual dispute and was free to credit the … evidence over the victim's out of court statements.").

[27] Hearsay is defined as a statement (an oral or written assertion or nonverbal conduct if intended as an assertion) other than one made by the declarant while testifying in the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(A) and (C). Hearsay is not admissible except as provided by law. La. C.E. art. 802; *State v. Jackson*, 15-0222, p. 10 (La. App. 4 Cir. 3/16/16), 191 So.3d 63, 69-70.

[28] *State v. Williams,* 18-0445, p. 17 (La. App. 4 Cir. 2/27/19), 265 So.3d 902, 915.

[29] La. C.Cr.P. art. 841. In the case *sub judice*, I note that defense counsel failed to make contemporaneous objections on the grounds being asserted on appeal on various admissibility arguments regarding N.P. Troy's medical report and testimony, including the admission of (1) a portion of N.P. Troy's testimony pertaining to the medical record of Victim; (2) N.P. Troy's testimony regarding Mother's reaction at Victim's medical examination; and (3) N.P. Troy's medical diagnosis. I have decided to review all of Defendant's assignments of error pertaining to N. P. Troy and address all pertinent legal issues stemming from her medical report although not clearly presented in the Appellant Brief or Motion in Limine. My decision to thoroughly review Defendant's assignments of error is based on the contents of Defendant's Motion in Limine that refers to Victim's history provided to N.P. Troy, on the inseparability of a patient's history and a

841(A) and La. C.E. art. 103], does not frustrate the goal of efficiency. Instead, it is specifically designed to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings.") (quoting *State v. Taylor*, 93-2201, pp. 4-7 (La. 2/28/96), 669 So.2d 364, 367-69, *cert. denied*, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996)); *State v. Mullen,* 18-0683, pp. 8-9, 269 So.3d 772, 779.

Third, a district court's error in admitting inadmissible evidence will not be disturbed on appeal when the error is harmless.[30] La. C.Cr.P. art. 921; *See State v.*

---

medical diagnosis, and on the nature of a child sexual abuse case and N.P. Troy's medical report and testimony. Moreover, such a review is not contrary to La. C.Cr.P. art. 841 or La. C.E. art. 103 and is required in the interest of justice. Consistent throughout expert witness testimony admissibility cases is defense counsel's lack of contemporaneous objections or court's rulings on a written motion, resulting in limited jurisprudential guidance and non-uniform analysis on admissibility issues in child abuse cases, especially when there is a strong harmless error analysis. *See, e.g., State v. Soler,* 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1074; *State v. Borden*, 07-396, p. 23 (La. App. 5 Cir. 5/27/08), 986 So.2d 158, 172; and *State v. Ockman,* 16-1615, p. 4 (La. App. 1 Cir. 9/15/17), ---So.3d---, 2017 WL 5643546 *2 (*unpub.*).

[30] In the case *sub judice*, although I find no reversible error with respect to the admissibility of evidence complained of by Defendant, I nevertheless apply a harmless error analysis to each admissibility argument made by Defendant to address Judge Ledet's dissent. I find that any abuse of discretion or error by the district court would constitute harmless error in light of the remaining testimony heard by the jury, the complained of testimony is merely cumulative or corroborative of other testimony adduced at trial, and the strength of the State's case. Particularly, the testimony of Victim admitting to the prior disclosures of rape and explaining the contents and surrounding circumstances of her prior inconsistent statements compared with her trial recantation testimony, together with the testimony of D.D. Jr., Mother, and Uncle in corroboration of Victim's prior inconsistent statements, is sufficient only to support a guilty verdict by the jury. Nevertheless, the testimony of Principal referred to in Judge Ledet's dissent is limited to the initial disclosure of abuse and not to the totality of the evidence reviewed by the jury including the subsequent recantations. Principal's acceptance of Victim's disclosure as truthful was based only on the initial disclosure surrounding circumstances whereas the jury's function includes all the testimony including the initial disclosures and recantations. Principal's assessment of Victim's credibility at the time of the initial disclosure did not usurp or taint the function of the jury nor "weighs heavily against a finding that the principal's testimony was surely unattributable to the verdict" as Judge Ledet's finds as her sole reason for reversing the jury's finding of guilt. Principal's testimony did not invade the province of the jury, bolter Victim's recantation testimony, or deny Defendant a fair trial. I am guided in making my harmless error analysis by the following case law: When hearsay testimony is improperly introduced into evidence, it will be considered harmless error if it is found to be cumulative and

*Foret,* 628 So.2d 1116, 1130-1131 (La. 1993); *State v. Williams,* 12-0252, p. 23 (La. App. 4 Cir. 4/17/13), 115 So.3d 600, 613*, writ denied*, 13-1141 (La. 11/22/13), 126 So.3d 477; *State v. Walker,* 99-2868, p. 8 (La. App. 4 Cir. 10/18/00), 772 So.2d 218, 223.

Lastly, a district court's decision to allow otherwise admissible substantive or impeachment evidence will constitute reversible error when its probative value is substantially outweighed by it prejudicial effect ("Probative/Prejudicial Balancing Test").[31] La. C.E. art. 403 reads: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 607(D) reads: "Other extrinsic

corroborative of other properly admitted evidence and did not contribute to the verdict. *State v. Hamdalla*, 12-1413, p. 12 (La. App. 4 Cir. 10/2/13), 126 So.3d 619, 625; *State v. Hall,* 02-1701, p. 5 (La. App. 4 Cir. 6/25/03), 851 So.2d 330, 333-34. An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. *Id.* Factors to be considered by a reviewing court in a harmless error analysis include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *State v. Sandifer*, 16-0842 (La. App. 4 Cir. 6/27/18), 249 So.3d 142, 164, *writ denied*, 18-1316 (La. 3/25/19), 267 So.3d 593, and *writ denied*, 18-1261 (La. 3/25/19), 267 So.3d 599, and *writ denied*, 18-1310 (La. 3/25/19), 267 So.3d 600, and *cert. denied sub nom. Newman v. Louisiana*, No. 19-5709, 2019 WL 5301451 (U.S. Oct. 21, 2019).

[31] A district court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. *State v. White,* 09-0025, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204. A district court's ruling admitting evidence carries with it an implicit conclusion that the court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *State v. Magee,* 11-0574, p. 49, n. 37 (La. 9/28/12), 103 So.3d 285, 320 ("[A]lthough the Court did not specifically rule on the admissibility of the statements under La. C.E. art. 403 (perhaps because it was not asked to), the Court admitted the statements, implicitly finding that their probative value substantially outweighed the danger of any" undue prejudice). "Logically, it falls to the district court in its gatekeeping function to determine the independent relevancy of such evidence and balance its probative value against its prejudicial effect." *State v. Garcia*, 09-1578, p. 54 (La. 11/16/12), 108 So.3d 1, 39. "In this analysis, the court seeks to answer the question: Is this evidence so related to the crime on trial or a material issue or defense therein that, if admitted, its relevancy will outweigh the prejudicial effect, which the defendant will necessarily be burdened with? " *Id.*, 09-1578, p. 55 108 So.3d at 39.

evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice."[32]

Applying these standard-of-review principles and applicable statutory and case law, I find no basis for reversal relative to the admissibility of the evidence. Particularly, I find no merit in Defendant's argument that reversal is required because Victim's prior inconsistent statements were inadmissible hearsay or unduly prejudicial. I find, as discussed fully *infra*, that these assignments of error by Defendant lack merit.

Specifically, I review the following four issues as to the admissibility of evidence: (1) whether the district court properly admitted into evidence Victim's prior statements as substantive evidence of Defendant's guilt under La. C.E. art. 801(D)(1)(a) and as impeachment evidence attacking Victim's trial recantation under La. C.E. art. 607; (2) whether La. C.E. art. 803(4) allows for the admission of N.P. Troy's medical records; (3) whether a portion of N.P. Troy's testimony

---

[32] In the case *sub judice*, after applying the Probative/Prejudicial Balancing Test, I find no reversible error with respect to the admissibility of any evidence. The fact evidence complained of by Defendant was highly probative in value in this familial child sexual abuse case and assisted the jury in assessing Victim's credibility as to her trial recantation. I find that the danger of unfair prejudice, confusion, or misapplication was substantially outweighed by the probative value of the complained of evidence under either an analysis based on La. C.E. art. 403 or La. C.E. art. 607(D). Any testimony regarding the surrounding circumstances of a child sexual abuse victim's actions, inaction, recantations, delayed disclosures, or inconsistencies is highly probative and should be given to the jury to assess and weigh. *See Chauvin*, 02-1188, p. 8, 846 So.2d at 702 (recognizing that sexual abuse often occurs in private and victims often "recant or alter their allegations of abuse"). Victim's prior inconsistent statement testimony was not unduly prejudicial in that the defense was afforded all safeguards available to obtain a fair trial, including cross examination and the ability to present a defense. The jury was entitled to hold the defense accountable for its failure to introduce sufficient evidence in support of its defense and hypothesis of innocence.

violated La. C.E. art. 704; and (4) whether a portion of Principal's testimony violated La. C.E. art. 701.

1. **La. C.E. art. 801(D)(1)(a) and art. 607(D): Admissibility of Victim's Prior Inconsistent Statements as Substantive and Impeachment Evidence**

In his second, third, fourth, and sixth assignments of error, Defendant raises issues as to the admissibility of evidence with respect to Victim's prior statements that contradicted her trial testimony; particularly objecting to the admission of Victim's statements made to A.A. and to Sgt. Lacey in the BWC videotape interview. Defendant complains that the district court improperly allowed these hearsay statements as substantive evidence of Defendant's guilt used for their assertive value in violation of La. C.E. art. 801(D)(1)(a) and as impeachment evidence of Victim's credibility used to discredit her trial recantation in violation of La. C.E. art. 607(D).

The Louisiana Code of Evidence has long provided for the admission into evidence of prior inconsistent statements as impeachment and substantive evidence, including statements that incriminate a defendant but only if certain requisites for satisfactory assurance of fairness and trustworthiness are met.[33] Under La. C.E. art. 607(D), a prior inconsistent statement is admissible as impeachment evidence; whereas, under La. C.E. art. 801(D)(1)(a), a prior inconsistent statement is admissible as substantive evidence. Article 607(D) requires a Probative/Prejudicial Balancing Test for satisfactory assurance of fairness and due process; whereas, Article 801(D)(1)(a) requires corroborative

---

[33] *See State v. Alridge*, 17-0231 (La. App. 4 Cir. 5/23/18), 249 So.3d 260, 277, *writ denied*, 18-1046 (La. 1/8/19), 259 So.3d 1021.

evidence as a requisite for satisfactory assurance of trustworthiness and reliability.[34] La. C.E. art 607(D) reads:

> Except as otherwise provided by legislation:
>
> (1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
>
> (2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

La. C.E. art. 801(D)(1)(a), which was added in 2004, presently reads:

> D. Statements which are not hearsay. A statement is not hearsay if:
>> (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
>>> (a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement[.]

Prior to the 2004 amendment, Louisiana courts generally recognized that when a non-party witness' credibility was attacked through prior inconsistent statements incriminating the accused, the evidence was generally not admissible

---

[34] Also, a La. C.E. art. 403 Probative/ Prejudicial Balancing test provides for satisfactory assurance of fairness and due process.

for its assertive value as substantive evidence of guilt.[35] *State v. Owunta,* 99-1569 (La. 5/26/00), 761 So.2d 528; *State v. Jones,* 48,624 (La. App.2d Cir. 1/22/14), 132 So.3d 505; *State v. Cobb*, 13-1593, p.11 (La. App. 1 Cir. 3/27/14), 144 So.3d 17, 25–26 ("[w]hile a witness's non-testimonial prior inconsistent statement can be used for impeachment purposes to attack the credibility of that witness, until the 2004 amendment to Louisiana Code of Evidence article 801D, it could not be used as substantive evidence of a defendant's guilt").

The 2004 revision of La. C.E. art. 801 D(1)(a) significantly expanded the definition of nonhearsay to include prior inconsistent statements "where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement." *Cobb*, 13-1593, p.11, 144 So.3d at 26 (article 801D(1)(a) now provides that a prior inconsistent statement is not hearsay and can be considered for the truth of the matter asserted, if the statement is corroborated). "Therefore, while prior inconsistent statements can be used to attack credibility under La. C.E. art. 607(D)(2), pursuant to the 2004 revision to La. C.E. art. 801(D)(1)(a), such nonhearsay statements are also admissible for their assertive value." *Rankin,* 42,412, p. 7, 965 So.2d at 950 (*citing* George W. Pugh *et al., Handbook on Louisiana Evidence Law,* p. 484, authors' note no. 9 to La. C.E. art. 607 and pp. 560-61, authors' note 3 to La. C.E. art. 801 (2007 ed.)).

In *State v. Wells,* 10-1338, p. 6 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 307, this Court recognized that the 2004 amendment to La. C.E. art. 801(D)(1)(a) made a witness' prior inconsistent statement in a criminal case non-hearsay

---

[35] I note that the jurisprudence relied on by Defendant predated the 2004 revision of La. C.E. art. 801(D)(1)(a). Defendant cites La. C.E. art. 801(D)(i)(d); *State v. Moran*, 90-0716 (La. App. 4 Cir. 7/1/91), 584 So.2d 318; *State v. Cousin*, 96-2973 (La.4/14/98), 710 So.2d 1065; and *State v. Manuel,* 94-0087 (La. App. 4 Cir. 11/30/94), 646 So.2d 487.

(citing *Rankin*, 42,412, p. 7, 965 So.2d at 951 and observing that prior statements to police by witness admissible to attack credibility and for "assertive value" after she recanted at trial). *See also State v. Fontenot*, 16-226, p. 19 (La. App. 3 Cir. 11/2/16), 207 So.3d 589, 600 (where the court found the jury not only heard evidence that corroborated victim's initial statements but also heard evidence that discredited victim's recantation at trial.)

This change in the law appears to have been partially intended to address issues of victim-witness coercion, intimidation, fear, and trauma associated with cases of sexual abuse and domestic violence, "which are among the most fertile grounds for non-cooperative non-party witnesses, " *Rankin*, 42,412, p.7, 975 So.2d at 950-951; *Wells*, 10-1338, p. 6, 64 So.3d at 307 (citing *See* Beloof and Shapiro*, Let The Truth Be Told: Proposed Hearsay Exceptions to Admit Domestic Violence Victims' Out of Court Statements as Substantive Evidence,* 11 Colum. J. Gender & L. 1 (2002)).

### a) Admissibility of Victim's Prior Inconsistent Statements as Substantive Evidence

La. C.E. art. 801(D)(1)(a) allows for the admission into evidence of prior inconsistent statement as substantive evidence used for its assertive value to prove the truth of the matter asserted only when there exists any corroborating evidence. The law views these prior inconsistent statements as nonhearsay and having indicia of reliability. Thus, the requisite for satisfactory assurance of trustworthiness in this article is that statements are corroborated by "any additional evidence." *Id.*

La. C.E. art. 801(D)(1)(a) requires that for a prior inconsistent statement to be admitted into evidence as nonhearsay and thus for substantive evidence of a defendant's guilt, the following circumstances must occur: (1) the declarant

testifies at trial and the prior statement is inconsistent with the declarant's trial testimony and subject to cross-examination concerning the statement; (2) the proponent of the statement has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact; and (3) there exists additional evidence to corroborate the matter asserted by the prior inconsistent statement.

The first and second circumstances are met. Victim was present at trial and subject to extensive questioning. The "value a jury places on a statement depends upon its declarant, and the defendant cannot challenge the declarant's credibility by cross-examination or other safeguards of reliability if the declarant is not present at trial." *State v. Greenberry*, 14-0335, p. 13 (La. App. 4 Cir. 11/19/14), 154 So.3d 700, 708 (citing *State v. Smith,* 11-0091, p.13 (La. App. 4 Cir. 7/11/12), 96 So.3d 678, 687). This was not the circumstance in the case *sub judice* because the declarant (Victim) was present at trial, Defendant was afforded the opportunity to bolster Victim's credibility as to her recantations and question Victim as to her motives for lying and reasons for her recantations and other safeguards of reliability. Also, a proper foundation was made such that Victim admitted to making the prior disclosures of abuse except for her disclosure to N.P. Troy which she provided unclear testimony stating that she cannot remember.

The third circumstance requires that additional evidence must corroborate the matter asserted by the prior inconsistent statement. In comparison, in other types of sexual assault cases where the victim does not recant the initial disclosures, the State is not required to introduce corroborating evidence. In such cases, in the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support

for the requisite factual conclusion. *See, e.g., State v. M.J.S.,* 05-380, pp.4-5 (La. App. 3 Cir. 11/2/05), 916 So.2d 1215, 1218-19 (where the court affirmed defendant's rape convictions, finding "nothing irrational in the trial court's credibility evaluations" where no corroboration of victims' testimony was required).

However, in trial recantation cases, corroborating evidence, both direct and circumstantial, [36] is a requisite for satisfactory assurance of indicia of reliability and trustworthiness. Louisiana courts have affirmed guilty verdicts in cases where a victim recanted disclosures of abuse at trial finding sufficient corroborating evidence. *See, e.g., Alfaro,* 13-39, p. 13, 128 So.3d at 524 (where evidence introduced at trial corroborated the victim's CAC interview and other witnesses' offered testimony that was consistent with the victim's CAC interview); *see also, Rankin*, 42-412, p. 8, 965 So.2d at 951 (where the victim's two early statements were corroborated each by the other and by her trying to get the charges against her boyfriend dropped); and *Celestine*, 17-275, p.8, 232 So.3d at 111 (where the court found that although the victim recanted at trial her previous allegations, her prior statements were corroborated by evidence of the victim's reporting to other individuals).

Similarly, in the case *sub judice*, Victim's consistent and detailed disclosures of rape were corroborated each by the other and by her brother's testimony that Victim and Defendant frequently went into a separate room to clean while the other siblings were told to remain in the other room to do their homework, and by

---

[36] Corroborating evidence can include direct and circumstantial evidence. *See Barriffe v. Ortiz*, 476 So.2d 371, 378 (La. Ct. App.), *writ denied,* 478 So.2d 146 (La. 1985); *See also, Ceasar v. Crispy Cajun Rest.,* 94-30, p.7 (La. App. 3 Cir. 10/5/94), 643 So.2d 471, 476, *writ denied,* 94-2736 (La. 1/6/95), 648 So.2d 931; and *State v. Melbert,* 140, p.14 (La. App. 3 Cir. 11/30/94), 649 So.2d 740, 745.

the Victim's own testimony admitting to the disclosures with the exception of the disclosure to N.P. Troy which Victim claimed she does not recall. Mother and Uncle also corroborated Victim's statement that they worked on Mondays and Defendant stayed at home, the day that Victim stated the rapes occurred. The consistent and detailed testimony of the State's witnesses— including the consistency of Victim's prior statements and her trial testimony as to the circumstances of and concerns for her family and N.P. Troy's testimony regarding Victim's emotional disclosure of rape following a recantation at the medical exam and sobbing disclosure to Mother, provided substantial corroborative evidence.[37] Victim's disclosure of rape to N.P. Troy and Mother, more than a month after Victim's initial disclosure, provides a substantial degree of corroboration, as does the testimony of Victim's brother. Victim's disclosures of rape were originally made under corroborating circumstances involving a secure and trusting environment and individuals (at her school to her best friend and principal and at a medical office to a nurse practitioner). This also provided considerable assurances of the statements' indicia of reliability serving as further corroborating circumstances that tend to indicate trustworthiness of her initial disclosures of

---

[37] Victim's excited utterances during the medical examination add to the reliability of her statement and are in line with the principles under a La. C.E. art. 803(2) analysis. At the examination, Victim noted that she was nervous about saying something wrong and after recanting her previous statements about the sexual abuse while crying, Victim recanted her recantation. When asked how Victim knew that what happened to her was not going to happen to Victim's sister, Victim immediately responded "because he does not call her away to his room privately as he does me." Victim's emotional statements to N.P. Troy and sobbing have the characteristics of an excited utterance. Statements are viewed as truthful and reliable if they are "excited utterances." Two basic requirements for excited utterance exception to the hearsay rule to have indicia of reliability are: 1) an occurrence sufficiently startling to produce a spontaneous and reflected statement, and 2) a statement made as a spontaneous reaction relating to the circumstances of the occurrence. *State v. Henderson,* 362 So.2d 1358 (La. 1978). Victim's response was spontaneously and immediately after N.P. Troy questioned the safety of Victim's sister, and, thus, has indicia of reliability.

abuse enough to allow a jury to assess and weigh such evidence and to afford Defendant all available due process and fairness safeguards.

Additionally, the BWC videotape recorded on November 4, 2016 (11 days after an alleged rape) contained Victim's detailed disclosure of rapes. In the video, Victim related that Defendant had raped her multiple times and the attacks occurred on Mondays, when Mother and Uncle were at work. Victim related that the most recent abuse took place on October 24, 2016, and that Defendant attempted to rape her on November 1, 2016. The BWC videotape statement by Victim, as recorded, provides substantial corroboration of Victim's claims of sexual abuse.

Moreover, during the CAC interview, medical exam, and at trial, Victim did not deny making the disclosures of rape to A.A., Det. Augustus, Sgt. Lacey, and Principal. Mother also testified that Victim made such statements. Thus, facts surrounding Victim's motives for lying and reasons for her recantation are central to the corroboration of the prior disclosures of rape. These facts speak to the credibility of Victim's out-of-court statements. Further corroborating evidence is found in the comparison of the evidence of Victim's consistent and detailed disclosures of abuse with Victim's multiple unsubstantiated motives for initially lying about the abuse (bad grades, embarrassing stories, and testing friendship) and the circumstances of her recantation (Mother told her to tell the truth and provided a recantation script).  Victim's manner of recantations, in itself, serves as a corroborating circumstance that tends to indicate trustworthiness of her disclosures of rape. The serious nature of the disclosures also enhances the weight of the corroborative evidence. With respect to the reliability of evidence regarding sexual abuse, important consideration must be given to whether "the child's statement

47

discloses an embarrassing event that a child would not normally relate unless true, ... or describes a sexual act beyond a child's normal experience."[38]

Defendant complains that Victim's prior disclosures of abuse were highly prejudicial evidence such that he was denied due process. I find no violation of Defendant's due process rights. The primary criterion for admissibility and due process analysis is the indicia of trustworthiness and reliability of the statements, and such a criterion was met as previously discussed. The Louisiana Supreme Court recently addressed a defendant's due process rights in *State v. Wilson*, 17-908 (La. 12/5/18), ---So.3d---, 2018 WL 638216. "Fundamental to due process of law is the right to present a defense, C*hambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and to have it fairly considered by the jury, *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)." *Id.,* 17-908, p. 6, 2018 WL6382216 at *3. "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984)). "This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Wilson,* 17-908, p. 6, 2018 WL6382216 at *3 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 1731, 164 L.Ed.2d 503 (2006)). I find that the evidentiary rulings of the district court admitting Victim's prior inconsistent statements, which have indicia of reliability as previously discussed, did not arbitrarily restrict Defendant's right to a fair trial or

---

[38] Michael H. Graham, *The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prosecutions: The State of the Relationship,* 72 MINN. L. REV. 523, 532 (1988).

infringe "upon a weighty interest." Defendant was afforded all safeguards available to him; and failed to provide an adequate defense.[39] The jury was entitled to hold Defendant accountable for his failure to introduce sufficient evidence in support of his defense.

To hold otherwise and exclude evidence of a child victim's disclosures of rape due to a trial recantation, as Defendant argues, would in effect exclude the only evidence often available in familial child abuse cases, which are often characterized by secrecy, intimidation, fear, and trauma. The Louisiana Supreme Court recognized in *Chauvin*, that "child sexual abuse cases are not easy to prosecute" because the abuse "most often occurs in private, often the perpetrator is a member of the victim's family, and physical evidence of the abuse is rare." *Chauvin*, 02-1188, p. 8, 846 So.2d at 702. The district court's admission of the evidence did not infringe on Defendant's due process right and Victim's prior statements are highly probative.

I find that corroborative evidence, both direct and circumstantial, provided satisfactory assurance of reliability of Victim's prior statements and were properly admitted for its substantive assertive value for the juror to assess and weigh. The jury was able to observe Victim's demeanor and mannerisms on the BWC videotape and compare those to her appearance at trial. Clearly, the jury believed Victim's statements made to A.A. and others over those she made on the stand at trial. According credit to the good sense and fair-mindedness of the jury, the guilty verdict rendered in the case *sub judice* was unattributable to any error by the district court in admitting the prior inconsistent statements and was not the result of

---

[39] *Clements*, 15-0630, p.8, 194 So.3d at 717 (finding that a reviewing court will "*only* tread on a jury's presumed acceptance of a witness' testimony when that testimony is implausible or clearly contrary to the evidence") (emphasis in original).

undue prejudice to Defendant or jury confusion or misapplication. *See State v. Henry*, 11-1137, p. 13 (La. App. 4 Cir. 10/24/12), 102 So.3d 1016, 1024; s*ee also, State v. Klein,* 18-0022, p.23 (La. App. 4 Cir. 8/22/18), 252 So.3d 973, 987, *writ denied,* 18-1569 (La. 4/15/19), 267 So.3d 1125; and *State v. Fleming,* 90-1953, (La. App. 1 Cir. 12/27/91), 593 So.2d 1298, 1300 (where the court found that the district court properly admitted evidence that corroborated witness testimony, where the evidence was not merely cumulative, was highly relevant, and its probative value clearly outweighed any danger of unfair prejudice and, rather than confusing or misleading the jury, the evidence served to enhance the jury's understanding of witness's testimony).

I find that Victim's prior disclosures of rape had satisfactory assurances of reliability and were properly introduced as substantive proof of guilt for the jury to assess and weigh. Defendant's assignments of error based on these arguments have no merit.

**b) Admissibility of Victim's Prior Inconsistent Statements as Impeachment Evidence**

Defendant also argues that the district court committed reversible error by admitting Victim's prior disclosures of rape as impeachment evidence to discredit her trial recantation. Under La. C.E. art 607(D), prior inconsistent statements incriminating a defendant are admissible as impeachment evidence if its prejudicial effects substantially outweigh its probative value. La. C.E. art. 607(D)(2); *State v. Cousin,* 96-2973, pp. 8-13 (La. 4/14/98), 710 So.2d 1065, 1069-72. Thus, the requisites for satisfactory assurance of fairness and due process in this article are that the statements must not be unduly prejudicial. "Louisiana has long sanctioned the impeachment of a witness in a criminal trial by his or her prior inconsistent

50

statements." *State v. Junior,* 03-2425, p. 52 (La. 6/29/05), 915 So.2d 291, 330

(citing La. C.E. art. 607(D)(2) and *State v. Owunta,* 99-1569 (La. 5/26/00), 761

So.2d 528, 529). The admissibility of evidence under La. C.E. art. 607 is subject to

the balancing standard of La. C.E. art. 403. *State v. Mills,* 12-0851, p.10, n.4 (La.

App. 4 Cir. 7/3/13), 120 So.3d 802, 809; *State v. Morgan*, 12-2060, p. 18 (La. App.

1 Cir. 6/7/13), 119 So.3d 817, 829.

   In light of Victim's contradiction of the testimony of the State's witnesses

and her recantation of the sexual assault allegations, the State permissibly

introduced Victim's prior statements to impeach her credibility.  The State

introduced evidence to impeach Victim's trial testimony that she was lying when

she made the allegations of sexual abuse against Defendant. As fully discussed in

the previous section, Victim's prior statements were highly probative and

Defendant was not unduly prejudiced by their admission into evidence. The district

court did not err in allowing the impeachment evidence. Defendant's assignments

of error based on these arguments have no merit.

## 2. La. C.E. art. 803(4): Admissibility of Victim's Statements and Medical Records for Medical Purposes as Substantive Evidence

   Defendant also contends that the district court erred by admitting Victim's

medical records into evidence. La. C.E. art. 803(4) provides that medical records

are not excluded by the hearsay rule, even though the declarant is available as a

witness:

> (4) Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as

51

> reasonably pertinent to treatment or diagnosis in connection with treatment.

The medical treatment/diagnosis exception to the hearsay exclusion rule rests on the premise that a person is not likely to be untruthful to a healthcare provider whose treatment of the person will depend in part upon what the person tells the provider. McCormick on Evidence, § 277 (6th ed. 2006). The law views such statements as having indicia of reliability; and, thus, such statements are not excluded by the hearsay rule.

The requisites for satisfactory assurance of trustworthiness in this exception, as required by La. C.E. art. 803(4), are that the statement (1) was made for purposes of medical treatment and diagnosis in connection with treatment, and (2) described a medical condition or history. The rule also admits statements of the inception or cause of the condition, "insofar as reasonably pertinent to treatment or diagnosis." La. C.E. art. 803(4). Statements and diagnoses by healthcare providers may be embodied in medical records and may be admissible under the "regularly kept records" hearsay exception. *See Dardeau v. Ardoin*, 97-144 (La. App. 3 Cir. 11.5/97), 703 So.2d 695.

The hearsay exception provided by La. C.E. art. 803(4) has received particular application in cases of child sexual abuse, including statements of fault, because " 'the legislature has expressed an overriding interest in protecting child victims of sexual abuse by encouraging the admission of reliable hearsay evidence for the [jury] to weigh.'" *State v. Brown,* 97-2260, p. 8 (La.App. 4 Cir. 10/6/99), 746 So.2d 643, 648 (*quoting Folse v. Folse,* 98-1976, p. 19 (La.6/29/99), 738 So.2d 1040, 1050, and upholding the admission of a six-year old victim's statement to a hospital physician that her father had put his penis in her) (footnote omitted).

A broad application of the evidentiary standard for child sexual abuse cases is consistent with public policy regarding the welfare of children. *Id.* Moreover, special consideration in matters concerning juveniles is not new. *Folse*, 98-1976, p. 13, 738 So.2d at 1047. This Court and other circuits have long allowed statements by child sexual abuse victims and sexual assault victims to a treating physician under La. C.E. art. 803(4),[40] and have often affirmed a district court's ruling as to the admissibility of medical evidence under La. C.E. art. 803(4), finding no clear abuse of discretion.[41]

This Court in *State v. Williams*, found "especially considering the testimony of [a doctor] as to his need for the information insofar as referring the victim for treatment in the form of counseling for her psychological injuries, the statements

---

[40] *See, e.g., State v. Williams,*12- 0252, p. 23 (La. App. 4 Cir. 4/17/13), 115 So.3d 600, 612-13 (where this Court concluded that statements by a child rape victim to the forensic pediatrician that identified the defendant as her abuser and explained in detail the acts perpetrated against her were made for purposes of medical treatment and medical diagnosis in connection with treatment); *State v. Bennett,* 591 So.2d 783, 785 (La. App. 4th Cir. 1991) (where this Court found that a rape victim's statement that she had been raped and, more specifically, that she had been held by the neck and forced to sit on her assailant's penis were reasonably pertinent to the treatment and/or diagnosis); *State v. Thomas*, 08-1363 (La. App. 4 Cir. 7/22/09), ---So.3d---, 2009 WL 8688914 * 11 (*unpub.)* (where this Court found expert testimony fell within the scope of the hearsay exception provided by La. C.E. art. 803(4), was reasonably pertinent to treatment or diagnosis, and did not prejudice the defendant since the victim testified at trial and was available for cross-examination); *State v. Brown*, 97-2260 (La. App. 4 Cir. 10/6/99), 746 So.2d 643,649 (where this Court found expert's testimony relating victim's statement was admissible under La. C.E. art. 803(4), the medical treatment exception to the hearsay rule).

[41] *See, e.g., State v. Cyrus,* 11-1175, p. 20 (La. App. 4 Cir. 7/5/12), 97 So.3d 554, 565 (citing *State v. Richardson,* 97-1995, p. 14 (La. App. 4 Cir. 3/3/99), 729 So.2d 114, 122); *see also, State v. Morgan,* 45,110, pp. 26-27 (La. App. 2 Cir. 4/14/10), 34 So.3d 1127, 11432 (court held that a statement by a hospital physician that a rape victim reported to the hospital because she had been sexually assaulted was an exception to the hearsay rule because it was made for the purpose of medical treatment and diagnosis); *State v. James,* 02-2079 (La. App. 1 Cir. 5/9/03), 849 So.2d 574, 585 ( the court found that where an expert testified that it was his practice to take a complete oral history from the child to determine "any issues that the child might have that I might be able to help them with," the expert's questioning of the victim about sexual abuse served a diagnostic purpose); and *State v. Thom,* 615 So.2d 355, 363 (La. App. 5th Cir. 1993) (the court allowed an emergency room nurse at a hospital where a rape victim was treated to testify concerning statements the victim made concerning her complaints and how her physical and sexual attack occurred, because the statements were pertinent to the diagnosis of the victim's physical and psychological condition and the type of trauma which the victim suffered).

appear to have been admissible for purposes of medical treatment and medical diagnosis in connection with treatment pursuant to La. C.E. art. 803(4)." *State v. Williams*, 12-0252, p. 23, 115 So.3d at 612-13.[42]

In *Williams,* the doctor testified he did not provide any specific treatment "in the realm of medicine or actual laying of hands or surgery or that sort of thing." *Williams*, 12-0252, pp.17-18, 115 So.3d at 610. However, he said he referred the victim for "counseling as soon as possible." *Id.* The doctor further testified that he was the one who coordinated and helped place the victim into "a system that otherwise doesn't like dealing with sexually abused kids. And that is a form of medical treatment." 12-0252, p.18, 115 So.3d at 610. This Court held the testimony to be admissible under La. C.E. art. 803(4).[43]

In *State v. Thom,* 615 So.2d 355, 363 (La. App. 5th Cir.1993), the court held that evidence in the form of testimony of an emergency room nurse at a hospital where a rape victim was treated concerning statements the victim made concerning the victim's complaints as to how her physical and sexual attack occurred was admissible pursuant to La. C.E. art. 803(4). "These statements were pertinent to the diagnosis of the victim's physical and psychological condition and the type of trauma which the victim suffered. They were also pertinent to determine the treatment which was necessary for the victim's physical and psychological

---

[42] This Court found that the trial transcript reflected that the district court gave ample consideration to the arguments on both sides of this issue, ultimately concluding that such history was relevant to both diagnosis and treatment and that it was admissible for treatment purposes. *Williams*, 12-0252, p. 16, 115 So.3d at 609. However, the exception provided for in La. C.E. art. 803(4) expressly applies to statements made solely for the purpose of medical diagnosis in connection with treatment. *Williams,* 12-0252, p. 17, 115 So.3d at 609-10.

[43] *Compare State v. Coleman,* 95-1890 (La. App. 4 Cir. 5/1/96), 673 So.2d 1283 (where the victim was referred to a physician some eighteen months after the alleged sexual abuse occurred, and the victim received no treatment as a result of the evaluation, this court held the testimony to be admissible under La. C.E. art. 803(4)).

injuries." *Thom,* 615 So.2d at 363. Therefore, the *Thom* nurse's testimony was admissible.

In *State v. Morgan,* 45,110, pp. 26-27 (La. App. 2 Cir. 4/14/10), 34 So.3d 1127, 1143, the court held that a statement by a hospital physician that a rape victim reported to the hospital that she had been sexually assaulted was an exception to the hearsay rule because it was made for the purpose of medical treatment and diagnosis and, therefore, fell under the hearsay exception provided by La. C.E. art. 803(4). Accordingly, the *Morgan* physician's testimony was admissible.

In *State v. Cotton*, 16-0081, pp. 6-7 (La. App. 1 Cir. 9/16/16), 2016 WL 5018530 *3 (*unpub)*, the court found that N.P. Troy's (same expert in case *sub judice*) testimony was properly admitted pursuant to La. C.E. art. 803(4), as her interview and examination of the victim supplied N.P. Troy with critical information so that she might recommend treatment if necessary. The court noted that N.P. Troy was the first medical professional to see the victim, was a nurse practitioner, advanced in terms of her qualifications to diagnose and to treat independently, and she examined the victim for the purposes of medical diagnosis and treatment. *Id.* The fact that the victim did not require treatment in *Cotton* did not preclude the application of La. C.E. art. 803(4). *Id.* Thus, N.P. Troy's testimony in *Cotton* was admissible.

Accordingly, and in line with *Williams, Thom, Morgan* and *Cotton,* the district court did not err by admitting the medical records, as they were subject to the hearsay exceptions provided by La. C.E. art. 803(4).

Under the totality of the circumstances in the case *sub judice,* the admission of N.P. Troy's testimony is warranted. N.P. Troy was the first medical professional

to see Victim, and is an advanced nurse in terms of her qualifications to diagnose and to treat independently. N.P. Troy testified she conducted a medical examination of Victim on December 14, 2016, and memorialized those findings in her report. N.P. Troy examined Victim for any signs of external injuries, such as burn marks, scars, signs of self-cutting, or evidence of victimization and provided general testimony about her examination protocols and her examination of Victim. Before the examination, Victim recanted her prior statements to A.A., Principal, the police, and DCFS but, in further discussion with N.P. Troy, admitted that what she said about Defendant raping her was true. The examination was performed to determine whether any physical evidence of sexual abuse existed to support her allegations of sexual abuse. Thus, N.P. Troy's interview and examination of Victim supplied N.P. Troy with critical information so that she might recommend treatment if necessary. Moreover, the law requires the development of a "service and treatment plan" in child sexual abuse cases.[44]

The medical records demonstrate that as a result of N.P. Troy's interview and examination, Mother, as parents were routinely, was instructed to bring Victim back for additional testing, such as blood work, to development a supportive

---

[44] *See* La. Ch. C. art. 510 (7), which reads: "The interagency protocols for the multidisciplinary investigation of allegations of child abuse shall include but not be limited to agreement about the following issues: . . . (7) Procedures for developing a service and treatment plan for the child victim and his family. " La. Ch. C. art. 524 (B) provides, in pertinent part, that a child advocacy center shall be governed and managed so as to provide at a minimum, for the following:

> (7) Specialized medical evaluations and treatment as part of the multidisciplinary investigative team response, either at the center or through coordination with and referral to other appropriate treatment providers.
> (8) Specialized mental health services as part of the multidisciplinary investigative team response, either at the center or through coordination with and referral to other appropriate treatment providers.
> (9) Victim support and advocacy as part of the multidisciplinary investigative team response, either at the center or through coordination with and referral to other appropriate treatment providers.

system for Victim and to bring Victim to counseling, as prescribed. *See State v. Lawrence,* 98-0348, pp. 9-10 (La. App. 4 Cir. 12/1/99), 752 So.2d 934, 940-41 (where this Court found that expert's testimony was admissible and properly admitted under Article 803(4), where the medical records demonstrate that as a result of doctor's interview and examination, she referred victim to a therapist for psychological counseling.) Therefore, N.P. Troy's testimony and the medical records of Victim are admissible under La. C.E. art. 803(4). Defendant's assignment of error number four has no merit.

**3. La. C.E. art. 704: Admissibility of Portions of N.P. Troy's Expert Testimony**

In his sixth assignment of error, Defendant argues that State witness, N.P. Troy, testified in violation of La. C.E. art. 704, which provides:

> Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.

Under the Code of Evidence, an expert opinion is not to be held inadmissible "solely" because it embraces an ultimate issue to be decided by the fact finder except that an expert cannot express an opinion as to the guilt or innocence of the accused.[45] Expert testimony becomes problematic when it is unduly prejudice

---

[45] La. C. E. art. 704; *State v. Bancroft,* 92-2623(La. App. 4 Cir. (6/15/93), 620 So.2d 482 (expert witness could not testify as to whether the defendant had the specific intent to kill; however, the court implied the expert could testify as to whether the defendant had the capacity to form specific intent); *State v. Trahan,* 93-1116 (La. App. 4 Cir. 5/20/94), 637 So.2d 694, 697 (in vehicular homicide case, the officer was qualified as an expert in accident reconstruction but he should not have been allowed to testify that based on the injuries and other evidence, in his opinion the defendant was the driver, not the passenger; under the circumstances of the case, the testimony was tantamount to saying the defendant was guilty); *State v. Birdsong,* 452 So.2d 1236 (La. App. 2nd Cir. 6/6/84) (discusses the scope of expert testimony in connection with issues to be decided by the jury); *State v. Butler,* 563 So.2d 976 (La. App. 1st Cir.1990).

because it invades the province of the jury by improperly bolstering a child-witness's testimony. *Chauvin,* 02-1188, p. 8, 846 So.2d at 702.

Defendant cites four instances of N.P. Troy's testimony in which she allegedly exceeded the permissible limits of her expertise, thereby violating La. C.E. art. 704. Defendant's four arguments in support of assignment of error number six are as follows: (1) N.P. Troy's direct testimony regarding the detrimental effect of having Victim meet with defense counsel instead of going to mental health counseling was prejudicial and not within the scope of her expertise; (2) during redirect examination, N.P. Troy was improperly questioned; (3) N.P. Troy's testimony on lack of support impermissibly assessed Victim's credibility during direct examination, and (4) N.P. Troy's testimony about her medical diagnosis[46] impermissibly assessed Victim's credibility during direct examination.

First, the defense complains about N.P. Troy's direct testimony regarding the detrimental effect of having Victim meet with defense counsel instead of going to mental health counseling:

> Q. What type of affect would it have when a young girl after she is raped when instead of being brought back to a care center or brought to counseling she is brought to her rapist's attorneys? What type of psychological affect would that have on a young girl?
>
> MR. BONIN: Objection to speculation.
>
> THE COURT: Overruled.
>
> A. Absolute profound life changing. We tell parents that it isn't the abuse that causes suffering in adulthood and onward, but it is the lack of believing and protecting them. When kids make an outcry if they don't get that response then they carry great shame and guilt and depression and actually the research if saying it's not

---

[46] S*ee* note 29, *supra.*

psychological pain but it has implications for a cancer and diabetes and heart disease when kids have been through chronic abuse a child that is not believed or protected.

Defendant argues that, because N.P. Troy was not qualified as an expert in criminal defense investigation or tactics, the foregoing testimony was prejudicial and not within the scope of her expertise.

I find such testimony does not violate Article 704. N.P. Troy's testimony appears just vague enough to explain the long-range detrimental effects of child sexual abuse and common patterns of behavior in victims who do not receive counseling *in general*, not this *specific* victim. That would make her testimony permissible. *State v. Hampton,* 13-0580, p. 12 (La. App. 4 Cir. 2/19/14), 136 So.3d 240, 247. Defendant's first argument has no merit.

Second, Defendant argues that during redirect examination, N.P. Troy was improperly questioned as follows:

Q. And you actually asked [Victim] at one point during that interview, and we all got to hear it, about what her mom said to her when they were alone about her allegation that her father raped her. Do you recall that?

A. I do.

Q. And [Victim] said that never happened. There was never a moment when they were alone and had some type of conversation about this?

A. That is correct.

Q. Did that raise some red flags to you that the young girl was saying that her mom never spoke to her about her alleging that [Defendant] raped her?

A. Absolutely.

Q. Did that seem believable to you from that little girl?

A. Not from what I've heard from thousands to kids who come in saying, 'Mom was crying. ' She was asking, 'Why didn't you tell me? ' Where was I? How could that have happened? And not some complete silence in the face of that kind of disclosure.

I find that the foregoing excerpts during redirect examination did not express an opinion as to the guilt or innocence of Defendant; rather N.P. Troy testified that Mother's failure to inquire about the rape allegations, was not in line with what "thousands of kids" had told N.P. Troy after telling their own parents about suffering sexual abuse. That would make her testimony permissible and not in violation of Article 704. Defendant's second argument has no merit.

Third, the defense again argues that N.P. Troy's testimony impermissibly assessed Victim's credibility during direct examination. During her direct examination, N.P. Troy was asked:

Q. And based on that diagnosis and based on the lack of support that this [Victim's] gone through, what would your expectation be when she is called to the witness stand?

A. I believe that she has only been in contact with the mother from my understanding, so the support that she has not gotten will definitely impact her ability to be able to present to people that she doesn't know. It's hard enough for kids to come in and talk about anything, but the lack of support, it has me very concerned for a child being put in that position.

With respect to the trial testimony quoted in the last paragraph of N.P. Troy's direct examination above, N.P. Troy's testimony did not express an opinion as to the guilt of Defendant but only that Victim might have difficulty relating the facts of what happened to the jury due to the obvious lack of a support system, which N.P. Troy testified is recognized as generally beneficial to a victim in a

child sexual abuse medical case. That would make her testimony permissible and not in violation of Article 704. Defendant's third argument lacks merit.

Fourth, the defense indirectly argues that N.P. Troy's medical diagnosis testimony was in violation of Article 704 and impermissibly assessed Victim's credibility during direct examination. During her direct examination, N.P. Troy was asked:

> Q. You stated that you make diagnosis when you examine these children. Specifically, to [Victim] what was the diagnosis you made?
>
> A. Child sexual abuse chronic.

I find that this error was not preserved for appellate review.[47] Even assuming, *arguendo*, that Defendant properly preserved this medical diagnosis issue, I do not find such testimony in violation of Article 704, as it did not express an opinion on the guilt or innocence of Defendant in the context of Article 704.

Medical diagnosis testimony in child sexual abuse cases has been allowed under an Article 704 analysis in the Third Circuit[48] and Fifth Circuit.[49] However, in

---

[47] *See* note 46, *supra*.

[48] *See, e.g., State v. Hillman*, 92-706, p.23 (La. App. 3 Cir. 2/3/93), 613 So.2d 1058 (where a doctor testified that the victim was a sexual abuse victim because she exhibited many of the characteristics consistent with a victim of child sexual abuse, and the court found that doctor did not express an impermissible opinion in violation of Article 704 and his "testimony … assist[ed] the trier of fact in understanding the behavior pattern of a child who may have been the victim of child sexual abuse"). Similarly, N.P. Troy's testimony was that Victim displayed characteristics typical of those who had suffered child sexual abuse, not an opinion in violation of Article 704.

[49] *See, e.g., State v. Soler,* 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1080. This Court has not specifically address the issue as to a particular medical diagnosis testimony but in *State v. Bunley*, 00-0405, (La. App. 4 Cir. 12/12/01), 805 So.2d 292, this Court allowed an expert in forensic pathology to testify that the victim died of natural causes finding that he was not rendering an opinion as to the defendant's guilt. *Bunley*, 00-0405, p. 13 (La. App. 4 Cir. 12/12/01), 805 So.2d 292, 302. Similarly, N.P. Troy testified within her expertise and did not render an opinion as to Defendant's guilt.

*State v. Schwaner,* 18-1012 (La. App. 1 Cir. 2/28/19), --So.3d---, 2019 WL 990223 (*unpub.*), the First Circuit, though not thoroughly addressing the merits of the Article 704 medical diagnosis issue, found that the identical medical diagnosis of N.P. Troy was inadmissible but harmless error.[50] I do not agree with the First Circuit that N.P. Troy's medical diagnosis testimony is in violation of Article 704, but instead find guidance in the Fifth Circuit case of *State v. Soler,* 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1080.

In *Soler,* a doctor testified that the acts described by the victim constituted molestation.[51] The court found that "doctor did not express an opinion on defendant's guilt; he merely stated that the acts described by the child constituted molestation." *Soler*, 93-1042, 636 So.2d at 1080. Further, "[t]he jurors were free to form their own opinion as to whether to believe the child's allegations and whether defendant was the person who had abused the child, assuming they accepted [the doctor's] opinion." *Id.* The court noted that "[t]he jury's role is that of ultimate fact finder: the jurors relate background knowledge from the expert to the facts established by evidence at trial and make a determination of the defendant's guilt." *Id.*

---

[50] In *Schawner*, the First Circuit found that N.P. Troy's "sexual abuse, chronic" medical diagnosis testimony was an expression of an opinion as to the defendant's guilt or innocence, and that this testimony should not have been allowed into evidence, but concluded that although the presentation of such opinion testimony was troubling, "we conclude that on this record, any error in allowing the presentation to the jury of evidence of Nurse Troy's opinion testimony under the ambit of a diagnosis of [the victim], was harmless beyond a reasonable doubt. " *State v. Schwaner,* 18-1012, p. 23 (La. App. 1 Cir. 2/28/19), ---So.3d---, 2019 WL990223 *12 (*unpub.*).

[51] During the doctor's testimony on direct examination, he testified about the victim's descriptions of the physical and sexual abuse. Further, on cross-examination, the defense counsel also questioned the doctor about the statements that the victim made to him about the abuse. Moreover, the doctor's report was introduced during the trial. *Soler,* 636 So.2d at 1079.

Moreover, as fully discussed in the previous section on La. C.E. art. 803(4), medical diagnoses play a vital role in criminal and civil cases and are often included in medical records admitted into evidence. Medical assessments and diagnoses are treated separate and apart from legal assessments. They have received particular application in cases of child sexual abuse, including statements that embrace fault, because of the nature of child sexual abuse and overriding interest in child sexual abuse cases to encourage the admission of reliable hearsay evidence for the jury to weigh. *Brown,* 97-2260, p. 8, 746 So.2d at 648.

I also find support for the admissibility of N.P. Troy's medical diagnosis in the Louisiana Supreme Court cases of *State v. Irish,* 00-2086 (La. 1/15/02), 807 So.2d 208, 212 and *State v. Green,* 81-2661, 416 So.2d 539, 541 (La. 1982).[52] In *State v. Irish*, the Court found the expert witness's testimony was a medical expert assessment of the likely medical impact of a gunshot wound to the head, and "not a legal assessment of the defendant's state of mind at the time of the shooting or an opinion of his guilt or innocence." *State v. Irish,* 00-2086, p. 6 (La. 1/15/02), 807 So.2d 208, 212. The Court importantly noted that "[u]nder La.C.E. art. 704, a trial judge may admit expert testimony which 'embraces an ultimate issue to be decided by the trier of fact, ' but the expert witness is not permitted to testify to the ultimate issue of a defendant's guilt." *Irish,* 00-2086, pp. 5-6, 807 So.2d at 212. Further, the

---

[52] In the recent case of *State in Interest of E.S*, which is distinguishable from the case *sub judice*, the Supreme Court found that an expert's testimony violated La. C.E. art. 704. *State in Interest of E.S.*, 18-01763, p. 18 (La. 10/22/19), ---So.3d---, 2019 WL 5435954 *11. Therefore, the Court found that the testimony attacked the veracity of the victim based on her age and lack of brain development, the inability of a child her age to sequence and recall events, and a high susceptibility to suggestiveness, but called doubt whether the victim could be believed if other evidence does not corroborate her statements. 18-01763, p. 18, 2019 WL 543594 at *11. Unlike the expert's testimony in *E.S.*, N.P. Troy's medical diagnosis testimony did not call doubt whether Victim could be believed or not nor did it address Defendant's guilt; she merely based the diagnosis on the acts described by Victim as part of a routine medical assessment of a patient.

Court noted that regardless of the words of the expert, "credit should be given to the common sense and fair-mindedness of the jurors who understand that the likely purpose of shooting someone in the head at close range with a high-powered rifle is to cause immediate death." *Irish,* 00-2086, p. 6, 807 So.2d at 213 (citing *State v. Green,* 81-2661, 416 So.2d 539, 541 (La. 1982) (recognizing "the common sense and fair-mindedness of jurors and their ability to distinguish meaningful evidence from unwarranted comments")). "The fact that the expert underscored this obvious result in no way prejudiced the defendant. " *Irish,* 00-2086, pp. 6-7, 807 So.2d at 213.[53]

Further, with respect to Defendant's argument that he was unduly prejudiced, a jury is not bound to follow the expert testimony; a fact-finder is free to accept or reject the conclusions of an expert witness. *State v. Moore,* 00-2282, pp. 10-11 (La. App. 4 Cir. 9/26/01), 797 So.2d 756, 763. Although the State or a defendant may choose to present expert testimony to aid the fact-finder's determinations, an expert's opinions may always be disregarded. *Moore*, 00-2282, p. 11, 797 So.2d at 763. The jurors could rely upon common knowledge and experience in finding that the State proved each element of the crime beyond a reasonable doubt. *Id.*

Following *Soler* and recognizing the ability of jurors to distinguish between a medical assessment and a legal assessment, and the overriding legislative interest in protecting child victims of sexual abuse by encouraging the admission of reliable evidence for the jury to weigh, I find that N.P. Troy's medical diagnosis testimony was permissible and not in violation of Article 704.

---

[53] When the lay juror would be able to make a common sense determination of the issue without the aid of an expert, the testimony is superfluous. Mark S. Brodin, *Behavioral Science Evidence in the Age of Daubert: Reflections of A Skeptic*, 73 U. CIN. L. REV. 867, 899 (2005).

N.P. Troy's medical diagnosis merely states that the acts described by Victim constituted a diagnosis of chronic sexual abuse for treatment purposes. N.P. Troy's diagnosis was based on the history provided by Victim during the medical examination. An expert's medical assessment of the impact of a crime, which relates to the medical treatment of a patient-victim, is easily distinguishable by jurors from a legal assessment of a crime, which relates to the guilt of a defendant. *See Irish*, 00-2086, p.6, 807 So.2d at 212. N.P. Troy did not take the place of the jury in determining the ultimate fact of Defendant's guilt or innocence in this case. The jurors in this case were not bound to follow N.P. Troy's expert testimony and accept her medical diagnosis; they were free to accept or reject any part of her testimony and free to form their own opinion as to whether to believe any or all of Victim's statements. The totality of N.P. Troy's testimony was medically objective and expressed in a manner that avoided commenting directly on the guilt or innocence of Defendant and on the credibility of Victim's recantations. Jurors have common sense and are fair-minded with an ability to understand the obvious and to distinguish meaningful evidence from unwarranted comments. In fact, a juror would be able to make a common sense determination of the issue of whether to believe Victim's disclosures of rape or recantations, without the aid of N.P. Troy's medical diagnosis; thus, her medical diagnosis testimony can be viewed as superfluous.[54] Defendant was not unduly prejudiced by the admission of the medical diagnosis testimony. Defendant's fourth argument has no merit.

Considering all of the foregoing conclusions, I find no error in the district court's admission of the challenged testimony of N.P. Troy.

---

[54] *See* note 53, *supra*.

**4. La. C.E. art. 701: Admissibility of Principal's Testimony as to Victim's Credibility**

Also, within his sixth assignment of error, Defendant argues that Principal, as a State witness, testified in violation of La. C.E. arts. 701, which provides that a lay witness, not testifying as an expert, may testify about her opinions or inferences which are: "(1) rationally based on the perception of the witness; and (2) helpful to a clear understanding of [her] testimony or the determination of a fact in issue." *State v. Diggins*, 12-0015, p. 25 (La. App. 4 Cir. 10/23/13), 126 So.3d 770, 790.

Defendant maintains that the State's questioning of Principal, concerning whether she believed Victim was truthful when Victim said Defendant raped her, elicited impermissible opinion evidence from a witness who had not been qualified as an expert:

Q.  And do you have experience with children and telling the truth versus lying in your profession?

MR. BONIN:  I mean, wait, objection.
COURT:  Overruled.
MR. BONIN:  She can't ask her if she believes her-
COURT:  These are not questions designed for an expert witness. This is just in the normal course and scope of her duties as principal. Overruled.

The prosecutor then asked Principal if, during her meeting with Victim, she had the impression Victim was being untruthful. Principal answered "No" and explained: "[Victim] never ever gave me any reason in the past to doubt that what she would tell me was the truth."

Defendant now argues that Principal was allowed to give improper testimony that was used as evidence of guilt. In addition, Defendant contends this

testimony had an enormous impact on the jury because it inferred that Victim's Principal believed that Defendant had raped Victim.

A lay witness may testify if the requirements of La. C.E. art. 701 are met. *Diggins*, 12-0015, p. 24, 126 So.3d at 790. As a general rule, a lay witness may draw reasonable inferences from his or her personal observations. If the testimony constitutes a natural inference from what was observed, no prohibition against it as the opinion of a non-expert exists, as long as the lay witness states the observed facts as well. *State v. LeBlanc*, 05-0885, p. 7 (La. App. 1 Cir. 2/10/06), 928 So.2d 599, 603 (citing *State v. Casey,* 99-0023, p. 12 (La. 1/26/00), 775 So.2d 1022, 1033. On appeal, a reviewing court must ask two pertinent questions to determine whether the district court properly allowed lay opinion testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness's observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. *Id*, 05-0885, pp. 7-8, 928 So.2d at 603.

Principal testified that, as a school principal, her job included questioning children on their behaviors to determine whether a child is telling the truth. Principal's testimony was not a direct comment on Victim's truthfulness at trial regarding her recantation but rather an inference drawn from her observations of Victim's demeanor, past interactions with Victim, and many years of experience with children with respect to a disclosure of abuse by a student. Such testimony is extremely probative in child sexual abuse cases and the risk of undue prejudice is minimized by the jury observing Victim's trial recantation and weighing the

evidence. The district court did not abuse its discretion by allowing Principal's testimony as to Victim's truthfulness at that point in time. [55]

Defendant's assignments of error two, three, four, and six as to admissibility of evidence have no merit.

### C. *Motion for New Trial: Assignment of Error Number 5*

In assignment of error number five, Defendant argues that his motion for new trial should have been granted because the verdicts are: (1) contrary to the law and evidence; (2) the product of the improper use of prior inconsistent statements; and (3) based upon improperly admitted opinion testimony from two of the State's witnesses.

Louisiana Code of Criminal Procedure article 851(1) provides that the court shall grant a motion for new trial whenever the verdict is contrary to the law and the evidence. A motion for new trial is based on the supposition that injustice has been done to Defendant; unless such injustice is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. La. C.Cr.P. art. 851. "The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments." *State v. Martin,* 13-0115, p. 12 (La. App. 4 Cir. 12/4/13), 131 So.3d 121, 129 (quoting C*elestine,* 00-2713, p. 8, 811 So.2d at 49). A district court's "ruling on a motion for new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion." *State v. Gordon*, 13-0495, p. 21 (La. App. 4 Cir. 7/16/14), 771 (citing *State v. Cox,* 10-2072, p. 1 (La. 11/19/10), 48 So.3d 275).

As previously determined in assignment of error number 1, the verdicts are not contrary to the law and the evidence, but rather are sufficient to support the

---

[55] *See* note 30, *supra.*

convictions. Likewise, as considered and discussed in assignments of error numbers 2, 3, 4, and 6, Defendant's arguments concerning the introduction of hearsay testimony, Victim's out-of-court statements as substantive evidence of Defendant's guilt, and whether Principal or N.P. Troy testified in violation of La. C.E. arts. 701 and 704 have no merit. Therefore, the district court did not err by denying Defendant's motion for new trial.

## V.  CONCLUSION

Considering the foregoing and finding no merit to any of Defendant's assignments of error, I affirm his convictions and sentences.

**AFFIRMED.**